RENDERED: NOVEMBER 15, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky



2017-SC-000189-DG
AND
2017-SC-000431-DG

DON HENSLEY      APPELLANT/CROSS-APPELLEE

V.

ON REVIEW FROM COURT OF APPEALS
CASE NOS. 2015-CA-001948-MR
AND
2016-CA-000164-MR
GARRARD CIRCUIT COURT NO. 13-CI-00308

KEITH A. GADD AND      APPELLEES/CROSS-APPELLANTS
JHT PROPERTIES, LLC

## OPINION OF THE COURT BY JUSTICE VANMETER

### AFFIRMING IN PART/
### REVERSING AND REMANDING IN PART

Restrictive covenants governing the use of real property are enforceable

according to their terms. The issue we must determine in this case is whether

the Garrard Circuit Court erred enforcing Deed of Restrictions for Woodlawn

Estates Subdivision Section II, by granting judgment in favor of Don Hensley

against Keith A. Gadd and JHT Properties, LLC[1] on the basis that Gadd was

---

[1] JHT Properties, LLC is a Kentucky limited liability company with its principal office in Lexington. Gadd is its managing member. The issues in the case concern two lots in the Subdivision, one owned by Gadd and one owned by JHT. At oral argument, counsel represented that JHT sold its lot after Hensley filed his complaint. This fact is reflected in both

renting private residences in the Subdivision as short-term vacation rentals in contravention of restrictions on commercial use of property. We hold that the trial court did not err, and we therefore reverse and vacate so much of the Court of Appeals' Opinion as reversed the trial court's judgment. We, however, affirm the Court of Appeals insofar as it affirmed the trial court's dismissal of Gadd's counterclaim for harassment.

## I.    Factual and Procedural Background.

In the early 1990s, Hensley and his wife, Marsha, developed the Subdivision as a lakeside development on Lake Herrington. The Hensleys reside in the Subdivision and own several properties there. As a part of the development, they executed and filed Deed of Restrictions Lots 1-15 Woodlawn Estates Subdivision Section II.[2] For purposes of our review, the significant provisions of the Deed of Restrictions are

> 1.    Lots 2 thru 15 shall be known and described as single family residential lots and shall be used only for residential purposes. Structures erected thereon shall be designed for and occupied by one family; no more than one residential structure shall be erected on each lot.

> 2.    Lot 1 shall be known and described as commercial lot and may be used only for single family, multi-family or commercial purposes. Commercial use shall be limited to food stores, marinas, offices, hotels, restaurants and similar retail of [sic] professional businesses; no wholesale, industrial or manufacturing activities shall be permitted.

> 13. No trade, business, or profession of any kind shall be carried out upon any residential lot nor shall anything be done

---

the trial court's Findings of Fact, Conclusions of Law and Judgment and Court of Appeals' Opinion. Gadd and JHT are hereinafter referred to collectively as "Gadd."

[2] The Deed of Restrictions is recorded in Deed Book 155, pages 642–46 in the Garrard County Clerk's office.

thereon which may become an annoyance or a nuisance to the neighborhood[.]

14. No sign for advertising or for any other purpose shall be displayed any place on any residential lot or on any residential structure on any lot except one sign for advertising the sale or rental thereof[.]

Keith Gadd owns Lot 3 in the Subdivision, and JHT owned Lot 2. No question exists but that both lots were covered by the Deed of Restrictions.

As found by the trial court, Gadd advertised the properties for short-term recreational residential use, placing ads on LexingtonRentalHomes.com using the phrase "vacation rental per night". The ads listed a nightly rental of $375 for Lot 2, and $300 for Lot 3. Ads on Homeaway.com advertised for nightly and weekly renters, with conditions of a 10% tax rate and a cleaning fee of $125.

In October 2013, Hensley filed a complaint against Gadd alleging violations of the restrictions and that Gadd's renters had created an "annoyance and or nuisance" to other owners in the neighborhood. Gadd answered and filed a counterclaim for harassment. KRS[3] 525.070, KRS 446.070.

The parties initially filed cross-motions for summary judgment in January 2014, which the trial court denied. After a period of discovery, the parties again filed cross-motions for summary judgment. At a hearing on the motions, the parties advised the court that all issues had been addressed by

---

[3] Kentucky Revised Statutes.

3

deposition and agreed for the trial court to try the case on depositions.[4] CR[5] 43.04(1). The trial court did so, and, on November 20, 2015, issued its Findings of Fact, Conclusions of Law and Judgment.

In addition to the matters set forth above, the trial court noted the complaints of other residents concerning Gadd's renters: occasional excessive noise, vehicles parked on the street, possible overuse of septic tank causing offensive odors and possible conduct damaging the Subdivision's golf course property. The trial court noted the communications between Hensley and the other deponents concerning complaints about noise, traffic, septic tanks, and potential damage that short-term rentals could have on the deponents' property values. The trial court did not make a finding that Gadd's renters and their activities constituted "an annoyance or a nuisance to the neighborhood" within the meaning of Restriction 13.

The trial court summarized Hensley's testimony, as follows:

[Hensley's] intention when imposing the restrictions was to limit rentals to single families for longer terms. He acknowledged that the specific term was not stated in the restrictions but indicated that he felt like a six month rental or a year rental would be a reasonable length of time. . . . He acknowledged that "single family" could include members of an extended family, as well as guest of that family. . . . [W]hen asked about whether a monthly rental would be okay, he acknowledged the ambiguity in the restrictions but insisted that he did not intend for rentals to be made only on a daily basis. . . . He described the overnight rentals as giving the

---

[4] In addition to testimony from the parties, i.e., Hensley's deposition and Gadd's affidavit, the trial court indicated it considered depositions of Maurice Wilcoxson, Norma Wilcoxson, Christian Thorup, Margie Thorup, Jim Cox, Patricia Cox, Jeffrey Burton, Teresa Burton, Linda Alexander.

[5] Kentucky Rules of Civil Procedure.

4

properties a "motel atmosphere" inconsistent with the neighborhood.

The trial court summarized the factual statements in Gadd's affidavit that he personally used the Lots approximately three months each year and denied any business use. He stated that various governmental agencies have investigated the neighbors' complaints and found no violations.

The trial court then examined the restrictions and recent case law from the Court of Appeals in which similar restrictions and factual situations were present. *Barrickman v. Wells*, No. 2013-CA-001578-MR, 2015 WL 2357179 (Ky. App. May 15, 2015); *Vonderhaar v. Lakeside Place Homeowners Ass'n, Inc.*, No. 2012-CA-002193-MR, 2014 WL 3887913 (Ky. App. Aug. 8, 2014); *Hyatt v. Court*, No. 2008-CA-001474-MR, 2009 WL 2633659 (Ky. App. Aug. 28, 2009). The court concluded that Gadd's use of the property, specifically short-term rentals, constituted a business in violation of Restriction 13, and that Hensley had not waived enforcement of the restrictions. The trial court entered judgment in favor of Hensley, enjoined Gadd from further violation of the applicable restrictions, awarded Hensley costs, denied Hensley's request for punitive damages, and dismissed Gadd's harassment counterclaim.

Gadd appealed, as a matter of right, to the Court of Appeals. That court determined that the restrictions were ambiguous in that they permitted rentals, but stated no time limit on those rentals, construed the restrictions against Hensley as the grantor, and noted other residents operated business from their homes (as supporting the imprecision of the restrictions). Ultimately, the Court of Appeals concluded that, in case of doubtful meaning, restrictions should be

5

construed in favor of the free use of property. Slip op. at 16 (citing *Connor v. Clemons*, 308 Ky. 9, 11, 213 S.W.2d 438, 439 (1948); *Glenmore Distilleries Co. v. Fiorella*, 273 Ky. 549, 556, 117 S.W.2d 173, 176 (1938)). As to Gadd's counterclaim of harassment, the court concluded that he had not proven harassment. The court therefore reversed the trial court's judgment enjoining Gadd's short-term rentals of the property, but affirmed dismissal of Gadd's counterclaim. Hensley moved this Court for discretionary review, and Gadd similarly requested discretionary review, both of which we granted.

## II.    Standard of Review.

The trial of this matter was by deposition by agreement of the parties under CR 43.04(1). In pertinent part, the rule provides "the court may upon motion or upon its own initiative, and with due regard to the importance of presenting the testimony of the witnesses orally in open court, order the testimony to be taken by deposition upon any issue which is to be tried by the court without a jury." *Id.* The trial court essentially conducted a bench trial. CR 52.01 states "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment." "[I]n granting or refusing . . . permanent injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action[.]" *Id.* Furthermore, "[f]indings of fact, shall not be set aside unless clearly erroneous,

6

and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*[6]

Interpretation or construction of restrictive covenants is a question of law subject to *de novo* review on appeal. *Triple Crown Subdivision Homeowners Ass'n, Inc. v. Oberst*, 279 S.W.3d 138, 141 (Ky. 2008).

### III. Analysis.

#### A. Restrictive Covenants.

The issues in this case revolve around a proper interpretation of the Deed of Restrictions. Kentucky decisions have recognized that "each case involving restrictions on the use of property, whether it be by reciprocal negative easements contained in conveyances or by a zoning ordinance, must be decided on its merits—on the particular terms of the instrument and the facts of the case." *Robertson v. W. Baptist Hosp.*, 267 S.W.2d 395, 397 (Ky. 1954). As both the trial court and Court of Appeals correctly noted, restrictive covenants are to be construed according to their plain language. "One primary rule of construction relating to all instruments is that every part of the instrument will be given meaning and effect when possible." *McFarland v. Hanley*, 258 S.W.2d 3, 5 (Ky. 1953).

> [A]s a fundamental and supreme rule of construction of contracts, the intention of the parties governs. That intention in respect to a restrictive covenant is to be gathered from the entire context of the instruments. Often the surrounding circumstances and the object which the covenant was designed to accomplish, which may be

---

[6] The Court of Appeals erroneously recounted that the Garrard Circuit Court entered a summary judgment, as opposed to a judgment following a trial on depositions. We perceive that to be a minor misstatement which did not impact its opinion.

7

revealed in part by a general scheme or plan of development, are important considerations where the meaning is doubtful.

*Parrish v. Newbury*, 279 S.W.2d 229, 233 (Ky. 1955) (citations omitted).

"[R]estrictions constitute mutual, reciprocal, equitable easements of the nature of servitudes in favor of owners of other lots of a plot of which all were once a part; that they constitute property rights which run with the land so as to entitle beneficiaries or the owners to enforce the restrictions[.]" *Ashland-Boyd Cty. City-Cty. Health Dep't v. Riggs*, 252 S.W.2d 922, 925 (Ky. 1952). Stated another way, "'restrictions are regarded more as a protection to the property owner and the public rather than as a restriction on the use of property, and the old-time doctrine of strict construction no longer applies.'" *Triple Crown*, 279 S.W.3d at 140 (quoting *Brandon v. Price*, 314 S.W.2d 521, 523 (Ky. 1958)).

"We must seek the intention of the grantor from the language used, considered in light of such factors as the general scheme of the subdivision. We may not substitute what the grantor may have intended to say for the plain import of what he said." *Mascolino v. Noland & Cowden Enters., Inc.*, 391 S.W.2d 710, 712 (Ky. 1965) (citation omitted). A similar rule applies when interpreting ambiguous restrictions, *i.e.*, the intention of the parties governs, with consideration given to the general scheme or plan of development. *Triple Crown*, 279 S.W.3d at 140. That said, courts are not to remake contracts for parties and create ambiguity where none exists. *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968). In *O.P. Link*, we admonished against giving a writing meaning which is not to be found in the instrument itself under the

8

guise of interpretation based on direct evidence of intention. *Id.* (citing 4 Williston on Contracts, § 610A (3d ed.1961)). Parties are bound by the clear meaning of the language used, the same as any other contract. *See Larkins v. Miller*, 239 S.W.3d 112, 115 (Ky. App. 2007) (stating that "a court should interpret the terms of the contract according to their plain and ordinary meaning[]").

These restrictions are unambiguous. In this case, Hensley created a single-family residential subdivision for Lots 2-15. On those lots, the use is limited to residential purposes, and the principal structure is to be a single-family residence. Further, "no trade, business, or profession of any kind [is] permitted to be carried out[,]" although rentals are permitted.[7] These restrictions are clear from Restrictions 1, 13 and 14. The Court of Appeals, however, ignored Restriction 2, which contains the lone exception to the residential use within the subdivision, in that on Lot 1 many uses are permitted: single-family, multi-family or commercial. That restriction further defines the meaning of commercial: "Commercial use shall be limited to food stores, marinas, offices, **hotels**, restaurants and similar retail [or] professional businesses; no wholesale, industrial or manufacturing activities shall be permitted." (emphasis added).

---

[7] As discussed, *infra*, short-term transient rentals of the type made by Gadd are not permitted under the Deed of Restrictions. Longer term residential rentals are permitted. Whether residential rentals may be for one month, six months or more, as testified by Hensley, is not necessary for us to decide.

9

The uses upon Lot 1 are countless: single-family, multi-family or commercial. The meaning of a "multi-family" undoubtedly includes a duplex, triplex, fourplex, an apartment building, and a multi-unit condominium. *See, e.g., Macy v. Wormald*, 329 S.W.2d 212, 213 (Ky. 1959) (holding that a four-unit apartment house, as a multiple family dwelling, violated restriction limiting subdivision to "only one residence . . . upon each lot[]"). Commercial is defined to include a number of uses, including "hotel." The plain meaning of "hotel" is "an establishment that provides lodging and usually meals, entertainment, and various personal services for the public." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hotel (last visited October 5, 2018). Kentucky case law supports a definition of "hotel" as place of lodging for the public. In *Clemons v. Meadows*, our predecessor court long ago recognized that

> Hotels are established and maintained for the purpose of serving the public. The opening of a hotel is an invitation to the public to become its guests. Hotels are not conducted for the social enjoyment of the owners, but for the convenience of the public, that is, those whose business or pleasure may render it necessary that they shall ask and receive food and shelter at a place of public entertainment for compensation. A hotel is a quasi public institution. Those who desire to conduct a hotel must first obtain a license from the commonwealth allowing them to do so. Laws have been enacted for the purpose of protecting the proprietors of hotels because of the public character of the business.

123 Ky. 178, 182–83, 94 S.W. 13, 14 (1906).

Kentucky statutes similarly define "hotel." *See* KRS 219.011(3) (defining "hotel"[8] as "every building or structure kept, used, maintained, advertised, or held out to the public as a place where sleeping accommodations are furnished to the public, and includes motels, tourist homes, and similar establishments, but excludes boarding houses and rooming houses[]"); KRS 243.055(1)(a) (defining "hotel"[9] as "any hotel, motel, inn, or other establishment which offers overnight accommodations to the public for hire[]"); KRS 306.010(1) (defining "hotel"[10] as "any hotel or inn, and includes an apartment hotel wherein furnished or unfurnished apartments are rented for fixed periods of time and the proprietor, if required, supplies food to the occupants[]").

By contrast, the uses upon Lots 2-15 are more limited: residential use, and only one single-family residence per lot. In *Robertson*, the court noted that "[t]he word 'family' is an elastic term and is applied in many ways." 267 S.W.2d at 396.[11] The question in this case does not turn on whether the

---

[8] Definition for purposes of Kentucky Hotel Act of 1972, KRS 219.011 to 219.081. KRS 219.011, 219.081.

[9] Definition for purposes of alcoholic beverage Hotel in-room service license. KRS 243.055(1).

[10] Definition for purposes of KRS Chapter 306, relating to Hotels. KRS 306.010.

[11] The *Robertson* court noted that the word "family" often is "given a broader meaning and may, and does sometimes, mean a collection of persons living together in a home, though none of them be married." 267 S.W.2d at 396 (quotation omitted). The court held that a home containing lodging for 20 hospital nurses with a matron or housemother was permitted in a zone designated as One Family Zone since the ordinance defined "'Family' as 'One or more persons living as a single housekeeping unit, as distinguished from a group occupying a hotel, club, fraternity or sorority house. A family shall be deemed to include servants." *Id.* As another example, in *Mullins v. Nordlow*, the term "a family" was construed as including a group of lodgers where the lessee cared for the rooms even though the lodgers had the exclusive right of occupancy of those rooms. 170 Ky. 169, 177, 185 S.W. 825, 828 (1916). While Hensley adduced proof that on one occasion Gadd rented to three families, this case can be decided without regard to the definition of family.

11

structure on Gadd's lot is a single-family structure. The restrictions are very clear that Lots 2-15 are to have a single-family residence, as opposed to a multifamily structure or a commercial structure, *e.g.*, hotel. Interpreting a very similar restriction in *Macy,* our predecessor court noted that "[t]he noun 'residence' itself is singular, and the definitions in Webster's New International Dictionary all indicate that a residence is a **dwelling place or abode of a single person or family unit.** This likewise is the commonly understood meaning." 329 S.W.2d at 213 (emphasis added).

As recognized by the trial court, the meaning of the terms "residential" and "reside" are important in deciding this case, as to whether Gadd's use or that of his renters constitutes residential use. The common meaning of the word "reside" is "to dwell permanently or continuously: [to] occupy a place as one's legal domicile." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reside (last visited October 9, 2018). Similarly, and as noted by the trial court, Black's Law Dictionary defines "residence" as "personal presence at some place of abode with no present intention of definite and early removal and with purpose to remain for undetermined period, not infrequently, but not necessarily combined with design to stay permanently." *Residence,* Black's Law Dictionary (5th ed. 1979).

In analyzing the restrictions and the facts of this case, we agree with the trial court and with Hensley that one-night, two-night, weekend, weekly inhabitants cannot be considered "residents" within the commonly understood meaning of that word, or the use by such persons as constituting "residential."

12

Gadd's use of the property meets the very statutory definition of hotel: a "building or structure kept, used, maintained, advertised, or held out to the public as a place where sleeping accommodations are furnished to the public." KRS 219.011(3). Interpreting every provision of the Deed of Restrictions, as we are required to do, leads to the inescapable conclusion that Gadd is operating a hotel on his property, when such use is permitted only on Lot 1. Gadd registered his operation as a hotel with the Commonwealth of Kentucky and collects tax on the rentals.[12] *See* KRS 139.200(2)(a) (assessing 6% tax on "rental of any room or rooms, lodgings, campsites, or accommodations furnished by any hotel, motel, inn, tourist camp, tourist cabin, . . . or any other place in which rooms, lodgings . . . or accommodations are regularly furnished to transients for a consideration[,]" but the tax does not apply to rentals of thirty days or more); KRS 142.400(2) (assessing transient room tax at 1% rate, but excluding any "rental or lease of any room or set of rooms that is equipped with a kitchen, in an apartment building, and that is usually leased as a dwelling for a period of thirty (30) days or more[]").

We note further support in this interpretation in Restriction No. 10 which prohibits "camping or similar itinerant residency . . . upon any lot." Anyone

---

[12] In June 2010, Gadd filed an Application for Permit/License to Operate a Hotel with the Cabinet for Health Services, Department for Public Health. The word "Hotel" was handwritten on a preprinted form. To the trial court, Gadd claimed that he only did so because "there was no category for 'vacation rental' and not because [Gadd] actually considered the properties to be [a] hotel or actually operated []88 Hunter Drive as a hotel." Defendants' Reply in Support of Renewed Cross-Motion for Summary Judgment . . ., November 4, 2015. Gadd's definition of a "vacation rental" is not stated, but if it is a "building or structure kept, used, maintained, advertised, or held out to the public as a place where sleeping accommodations are furnished to the public[,]" that likewise would seem to be a "hotel."

13

staying in a house in the subdivision is not *camping out*, as one might with a sleeping bag in a tent or under the stars, but "camp" also has a meaning synonymous with temporary residence: "a place usually away from urban areas where tents or simple buildings (such as cabins) are erected for shelter or for **temporary residence** (as for laborers, prisoners, or **vacationers**)." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/camp (last visited October 9, 2018) (emphasis added). "Itinerant" similarly connotes a temporary stay: "traveling from place to place." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/itinerant (last visited October 9, 2018). In *Union Nat'l Bank v. Brown*, 101 Ky. 354, 360, 41 S.W. 273, 274 (1897), the court colorfully defined "itinerant" as "here to–day and there to–morrow." The trial court correctly underscored the importance of these provisions in that transient, "short-term renters are not as motivated to be considerate of the neighbors or the surrounding property. The restriction, therefore, bears a rational relation to the developer's and the permanent residents' desire to maintain a quiet, well-maintained subdivision with sustained property values."

The Court of Appeals' significant conclusions were that 1) the restrictions permitted rental but placed no time limitation on that rental; 2) the restrictions emphasize the purpose of the occupation of the property, *i.e.*, "the actual use and activities on the property," and noted that Gadd used it for his living purposes, "sleeping, eating, and other residential purposes," a portion of the time and rented it to others for their living purposes at other times; and 3)

14

Gadd, in fact, did not conduct any business activities on the property since the offering and rental was conducted via the internet and from Gadd's Lexington office. We address each of these considerations in turn.

The fact that the restrictions permit rentals does not render the restrictions ambiguous insofar as this case is concerned. The issue before us is whether Gadd's renting on a short-term, transient basis is permitted under the restrictions. The clear answer is "no." We have no difficulty concluding that short-term rentals are prohibited because Gadd's advertising of such rentals renders his property the equivalent of a hotel, which is not a permitted use on his lot. Residential rentals are permitted. While we might be tempted to opine that a "residential rental" is one month or more, that issue is not before us.

The Court of Appeals' and Gadd's emphasis on residential uses—eating, sleeping, reading a book, watching TV—misses the point of the restrictions. Such activities could also occur on Lot 1, under the designation of multifamily or commercial, i.e., hotel, since a person occupying an individual unit in a multifamily structure or hotel could do all those things. As an aside, a person could also do those activities while camping. But no one could possibly conclude that a multifamily or commercial/hotel use is permitted on Lots 2-15. The limitation of those items to Lot 1 excludes those items from Lots 2-15, even though the possible activities thereon are virtually identical.

Finally, we reject the Court of Appeals' and Gadd's interpretation that Restriction No. 13— "[n]o trade, business, or profession of any kind shall be

15

carried out **upon** any residential lot[]"— was not violated since no commercial activity occurred there based on the reasoning that all advertising and financial transactions were conducted through the internet or telephone at Gadd's Lexington office. The short-term, transient occupancy of the lot was the business activity carried out upon the lot. The assertion otherwise is akin to a claim that the operation of a Webster County mine occurs in Jefferson County because all the paperwork and financial activity occurs at the Louisville home office of a mining company.

The parties and the lower courts analyzed the issues in this case by citation to three unpublished Court of Appeals opinions: *Barrickman v. Wells*, *Vonderhaar v. Lakeside Place Homeowners Ass'n, Inc.*, and *Hyatt v. Court*. While these cases contain useful analysis, they obviously are not binding on this Court. We reiterate that each case involving the interpretation of restrictive covenants turns on the "particular terms of the instrument and the facts of the case." *Robertson*, 267 S.W.2d at 397. For example, in *Barrickman*, the restrictions prohibited commercial use. A majority of the court believed that provision was ambiguous, since "commercial" was not otherwise defined. 2015 WL 2357179, at *2. Irrespective of the correctness of that conclusion, in this case, by contrast, Restriction 2 defines "commercial use" as "food stores, marinas, offices, hotels, restaurants and similar retail of [sic] professional businesses; no wholesale, industrial or manufacturing activities shall be permitted." Again, as noted, since "commercial use" is limited to Lot 1, it is excluded on Lots 2-15.

16

## B. *Waiver of Deed Restrictions.*

Gadd argues that Hensley waived enforcement of the restriction on commercial use since testimony showed that some owners had rented their properties and used them "as the actual situs of ongoing business." Specifically, Gadd claims that "Thorup operates his engineering consulting business from his property[,]" and "Burton operates a masonry business from his home." The trial court rejected this contention since "[t]he only proof offered was that any other violations of the restrictions were in-home uses which had no impact on the character of the neighborhood."

A waiver of restrictive covenants occurs when "'[a] change in the character of the neighborhood which was intended to be created by restrictions . . . generally . . . prevent[s] their enforcement in equity, where it is no longer possible to accomplish the purpose intended by such covenant.'" *Logan v. Logan,* 409 S.W.2d 531, 534 (Ky. 1966) (quoting *Bagby v. Stewart's Ex'r,* 265 S.W.2d 75, 77 (Ky. 1954)); *see also Colliver v. Stonewall Equestrian Estates Ass'n, Inc.,* 139 S.W.3d 521, 525 (Ky. App. 2003) (noting that "[a]rbitrary enforcement of covenants does not necessarily render covenants unenforceable[;]" only arbitrary enforcement that results "in a fundamental change in the character of a neighborhood" will render the covenants unenforceable).

We agree with the trial court that the only proof of other business activity concerned in-home uses that did not impact the character of the neighborhood as a residential subdivision. For example, no proof was adduced that Thorup's

clients or employees descended on the neighborhood at 9:00 a.m., coming and going throughout the course of the work day, and causing traffic congestion on the neighborhood streets. Nor was Burton operating a brickyard on his property, with commercial vehicles picking up or dropping off brick, sand or mortar. Similarly, Gadd's complaint about other owners' renting of their properties fails. As we have noted, the restrictions in this case permit residential rentals. The trial court correctly held that Hensley had not waived enforcement of the restrictions.

## C. *Issuance of Injunctive Relief.*

Gadd argues that the original injunction issued by the trial court failed to meet the specificity requirement of CR 65.02(1), which requires "(1) [e]very restraining order or injunction shall be specific in terms and shall describe in reasonable detail, and not by reference to the complaint or other document, the act restrained or enjoined." The trial court's judgment pertinently stated, as follows:

### JUDGMENT

For the reasons set forth above, Plaintiff is granted judgment against the defendants permanently enjoining them from further violations of the applicable restrictions and for his costs herein expended. The Court denies Plaintiff's request for punitive damages, there being no basis in law or fact for that claim. Defendant's Counterclaim is dismissed.

On the one hand, Gadd knows, or should know, perfectly well that he is prohibited from violating the restrictions by renting his property on a short-term, transient basis, whether such rentals are procured through LexingtonRentalHomes.com, similar internet sites, or other means. On the

18

other hand, residential rentals are permitted in the subdivision. We recognize the purpose of the rule is "'to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *White v. Sullivan*, 667 S.W.2d 385, 388 (Ky. App. 1983) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S. Ct. 713, 715, 38 L. Ed. 2d 661 (1974)). The trial court's judgment enjoining Gadd from further violations referred generally to "the applicable restrictions" and without reasonable detail. On remand, we trust that the trial court will issue a sufficiently specific injunction based on this opinion.

### D. Harassment.

Finally, Gadd claims that the trial court impermissibly dismissed his counterclaim against Hensley for harassment, based on KRS 525.070(1)(e). This statute states that "[a] person is guilty of harassment when, with intent to intimidate, harass, annoy, or alarm another person, he or she . . . [e]ngages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." Although this provision is in the penal code, Gadd asserts the claim as a private right of action under KRS 446.070, which provides "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

19

The commentary to the Kentucky Penal Code states that this subsection, which is designed as a "catch all" provision since listing all specific types of prohibited conduct would be impossible, "contains three elements: a course of conduct; alarm or serious annoyance of another person; and no legitimate purpose." KRS 525.070, Ky. Crime Comm'n/LRC Commentary (1974).

Gadd argues that summary judgment on his counterclaim was inappropriate. This argument fails because the trial court did not grant summary judgment. Rather the trial court granted judgment following a trial conducted upon depositions. And in this instance, the trial court concluded, as follows:

> [T]here is no evidence that [Hensley], or anyone else in the neighborhood, intended to harass, annoy or alarm Mr. Gadd. In fact, [Hensley] testified that he would like to have Mr. Gadd as a full-time resident in the subdivision as long as he honored the restrictions. All of the communications between the residents were appropriate given their concerns, and all were directed toward the proper enforcement of the restrictions.

We are unable to say that that the trial court's findings of fact on this issue are clearly erroneous, CR 52.01, or are unsupported by substantial evidence. *Talley v. Paisley*, 525 S.W.3d 523, 526 (Ky. 2017). Since the trial court found against Gadd on two of the requisite elements of harassment, a lack of intent to annoy or alarm, and a legitimate purpose, we affirm the Court of Appeals and the trial court on this issue.

## IV. Conclusion.

In conclusion, the Restrictions in this case limited commercial uses, such as a hotel, to Lot 1, and required Lots 2-15 to be used for single-family

residential purposes. Because Gadd used Lot 3 as the functional equivalent of a hotel, *i.e.*, a structure advertised or held out to the public as a place where sleeping accommodations are furnished to the public on a short-term transient basis, designated it as a hotel on forms provided to the Commonwealth, and correspondingly paid taxes to the Commonwealth on those rentals, his use of the property violated the Deed of Restrictions. We reverse the decision of the Court of Appeals insofar as it reversed the Garrard Circuit Court judgment prohibiting Gadd's short-term rentals of the property. We affirm the decision of the Court of Appeals as to it affirming the trial court's dismissal of Gadd's counterclaim. We remand this case to the Garrard Circuit Court for the issuance of injunctive relief in compliance with CR 65.02.

All sitting. Minton, C.J.; Cunningham, Hughes and Venters, JJ., concur. Wright, J., concurs in result only by separate opinion in which Keller, J., joins.

WRIGHT, J., CONCURRING IN RESULT ONLY: While I concur with the majority's result in this case, I write separately to explain my reasoning. This case and future cases obviously turn on the specific language of any restrictions. In the present case, the restrictions specify that a hotel may only be placed on Lot 1. Therefore, the majority's analysis as to what constitutes a hotel resolves the issue. However, without the provision restricting hotels to Lot 1, the restrictions would have been impermissibly vague, and therefore ambiguous. Ambiguous restrictions are construed against the grantor and in favor of free use of property. *McFarland v. Hanley*, 258 S.W.2d 3, 5 (Ky. 1953). Since I agree that the restrictions in the present case clearly limit commercial

21

use to Lot 1 and define commercial as including hotels, these restrictions are not ambiguous, and that issue is not before us. I therefore concur with the result of the majority opinion.

Keller, J., joins.

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

Frederick Short

COUNSEL FOR APPELLEES/CROSS-APPELLANTS:

Carroll Morris Redford III
Elizabeth C. Woodford
MILLER, GRIFFIN, & MARKS, P.S.C.