RENDERED: MARCH 3, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0054-MR

MOORE PROPERTY INVESTMENTS,
LLC                                                                    APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE ANGELA MCCORMICK BISIG, JUDGE
ACTION NO. 11-CI-002310

DR. LAURA FULKERSON AND
DR. TODD YATES                                                          APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, DIXON, AND TAYLOR, JUDGES.

CETRULO, JUDGE:  This matter is before the Court to determine whether the

Jefferson Circuit Court erred in finding a contract provision – resulting from a

mediation agreement – was enforceable and intended by the parties to have

permanency.  After review, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

In 2009, veterinarians Dr. Laura Fulkerson ("Fulkerson") and Dr. Todd Yates,[1] entered into negotiations to rent Suite B in a shopping center (the "property") owned by Appellant Moore Property Investments, LLC ("Moore Property"). The property contained two suites: Suite A was occupied by Moore Property and made up 52% of the premises; Suite B made up the remaining 48%.[2] After discussions, the parties executed both a lease and Lease to Purchase Option Agreement ("2009 Lease Agreement"). According to the agreed upon terms, Fulkerson was to be credited part of each monthly lease payment against the purchase price at closing; the lease term was for five years after Fulkerson opened the clinic for business; Moore Property could terminate the purchase option if Fulkerson was in default of the 2009 Lease Agreement or failed to comply with the terms and conditions of the 2009 Lease Agreement; and time was of the essence.

The 2009 Lease Agreement also included a fluctuating amount of additional rent – on top of the set monthly amount of $5,000 – to cover a percentage of the common area maintenance fees and taxes ("CAM expenses"). Moore Property estimated those CAM expenses at $750 per month, but that total

---

[1] Yates is no longer a party to this appeal.

[2] The record did not clarify what percentage made up the common area or if the "common area" only included jointly used assets such as plumbing, electrical, and/or the exterior of the property.

was subject to adjustment based on actual expenses paid; any deficit was to be collected at the beginning of the year and a new amount was to be set, based on the prior year's expenses. Also, if Fulkerson exercised her purchase option, the parties agreed to "execute a Contract for Deed in form reasonably acceptable to both parties for the full purchase price less any credits[.]"

In 2010, Fulkerson pursued her purchase option, due in part to the significant improvements she made to Suite B. Fulkerson approached a lender about financing the transaction, but her request was denied because a title search revealed Moore Property had not subdivided the property and was currently unable to convey good title. Fulkerson informed Moore Property that she was ready to exercise her purchase option but was unable to provide a closing date until the property was subdivided. Soon after, Moore Property informed Fulkerson that the CAM expenses for 2010 were more than seven times higher than his previous written estimate. It is apparent from the record that negotiations between the parties turned contentious and litigation resulted.

In its complaint, Moore Property requested the additional CAM expenses and a declaratory judgment that the notice to exercise the purchase option was defective and unenforceable. In her counterclaim, Fulkerson alleged fraud in the inducement, breach of contract and requested adjudication that the 2009 Lease Agreement had been properly exercised. The circuit court granted summary

judgment in favor of Moore Property. Fulkerson appealed and this Court reversed. *Fulkerson v. Moore Property Investments, LLC*, Nos. 2012-CA-000856-MR and 2012-CA-000893-MR, 2014 WL 3714373 (Ky. App. Jul. 25, 2014). This Court found that 1) summary judgment was premature, and 2) Moore Property's failure to subdivide the property *i.e.*, failure to obtain clear title – waived Fulkerson's specific performance obligation – *i.e.*, waived her failure to set a closing date as mandated by the 2009 Lease Agreement. This Court reversed and remanded, but did not address the CAM expenses argument.

Before proceeding to trial, the parties met twice for mediation at the end of 2015. Mediation yielded a fully executed Settlement Agreement ("2015 Mediation Agreement"). The 2015 Mediation Agreement included numerous modifications to the 2009 Lease Agreement. In relevant part, the 2015 Mediation Agreement stated the property would be divided pursuant to a condominium regime with Moore Property owning 52% and Fulkerson owning 48%. The 2015 Mediation Agreement also included a **Maintenance Provision**[3] that dealt with CAM expenses, which read as follows:

> 2. For common area expenses which are $1,000 or less, either party may select the service provider and have the work performed without prior notice to the other. For expenses for common areas which exceed $1,000, either party shall provide the other with the bid for said services prior to hiring the service provider. If the other party does

---

[3] We refer to Paragraph 2 and Paragraph 3 as the singular "Maintenance Provision" for clarity.

not object, the proposed service provider may perform the work. If the other party objects to the bid, he or she shall provide an alternative bid within 15 days. If the parties cannot agree on the work to be performed, they shall submit their differences to Ann O'Malley Shake. If she is not available for any reason, the disputed issue shall be submitted to a mutually agreeable mediator. The paint color of the exterior will not be changed absent the agreement of the parties or submission to the mediator.

3. The provisions of paragraph 2 do not apply to contracts with vendors, including without limitation the snow removal company, until such time that the current contract term expires.

The 2015 Mediation Agreement also stated, "[t]he parties will work in good faith to memorialize the terms of this settlement and the sale in subsequent documents which will be prepared by [Moore Property's] counsel and subject to approval by [Fulkerson's] counsel. However, the [2015 Mediation Agreement] is enforceable according to its terms." Unfortunately, the parties were unable to agree on the language for the sale documents.[4] Specifically, Fulkerson did not agree to Moore Property's attempt to *add language* that would terminate the Maintenance Provision upon a future sale of Suite B (Fulkerson viewed the Maintenance Provision as running with the land).

In 2018, Moore Property returned to circuit court and asked the court to find the 2015 Mediation Agreement unenforceable because it violated the statute

---

[4] An additional mediation in 2016 was also unsuccessful in completing the sale documents.

of frauds for failing to set forth all the essential terms. The circuit court did not accept Moore Property's argument and held the 2015 Mediation Agreement was enforceable because that agreement was not intended as a stand-alone real estate purchase contract, but rather it was intended to resolve disputed terms under the 2009 Lease Agreement. The circuit court did not address whether the Maintenance Provision of the 2015 Mediation Agreement was to become part of the condominium governing documents, thereby running with the land. Moore Property appealed to this Court.

In 2020, this Court affirmed the circuit court finding that the 2015 Mediation Agreement was a settlement agreement – not a contract conveying real property – and it was intended to relate back to the 2009 Lease Agreement; therefore, the statute of frauds did not apply, and the 2015 Mediation Agreement was enforceable. *Moore Property Investments, LLC v. Fulkerson*, Nos. 2018-CA-000577-MR and 2018-CA-001435-MR, 2020 WL 4515418 (Ky. App. Jul. 2, 2020). This Court did not determine whether the Maintenance Provision ran with the land because the argument was not properly before the Court.[5]

---

[5] The circuit court ruled on whether the Maintenance Provision ran with the land *after* Moore Property filed a notice of appeal. However, a notice of appeal transfers jurisdiction from the circuit court to the appellate court. *Watkins v. Fannin*, 278 S.W.3d 637, 639-40 (Ky. App. 2009) (quoting *City of Devondale v. Stallings*, 795 S.W.2d 954, 957 (Ky. 1990)). Without jurisdiction, the circuit court's order was void. *Moore Prop. Invs.*, 2020 WL 4515418 at *4-5. The circuit court refiled its order after jurisdiction was returned; that order is the basis of this appeal.

In 2021, Fulkerson asked the circuit court to answer the most pressing remaining issue between the parties: whether the Maintenance Provision of the 2015 Mediation Agreement ran with the land. In December 2021, the circuit court agreed with Fulkerson and found the Maintenance Provision was intended to run with the land. The order stated, "To the extent the parties have not been able to work in good faith to resolve this issue, the Court [] finds that because the [2015 Mediation Agreement] states the subject property will be divided pursuant to a condominium regime, that the [Maintenance Provision] run[s] with the land." The order did not state reasons why the agreement being subject to a condominium agreement meant the maintenance provision ran with the land.[6] Moore Property again appealed to this Court.

## II.    STANDARD OF REVIEW

A settlement agreement is a contract, governed by contract law. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). The construction and interpretation of a contract is a matter of law and is reviewed *de novo* without deference to the trial court's interpretation. *Spot-A-Pot, Inc. v. State Res. Corp.*, 278 S.W.3d 158, 161 (Ky. App. 2009) (citations omitted).

---

[6] Although the circuit court did not explain its factual finding as to the provision running with the land, Moore Property did not move for additional factual findings under Kentucky Rule of Civil Procedure ("CR") 52.04.

# III. ANALYSIS

On appeal, Moore Property argues that the Maintenance Provision (in the 2015 Mediation Settlement) should not be enforceable because it is not a properly recorded restrictive covenant and does not meet the necessary requirements to be enforceable. Moore Property argued the "restrictive covenant" does not run with the land, does not touch and concern the land, privity of estate does not exist between the parties, and public policy would prevent this Court from enforcing an unrecorded restrictive covenant. To support its argument, Moore Property cites to precedent, each with duly recorded property instruments (deed, declaration of covenants, deed of restrictions, etc.).[7] However, that is not consistent with the facts before us.

---

[7] *Hensley v. Gadd*, 560 S.W.3d 516 (Ky. 2018), enforced a restrictive covenant recorded in the Deed of Restrictions and reversed this Court's "free use of property" finding; *Triple Crown Subdivision Homeowners Association, Inc. v. Oberst*, 279 S.W.3d 138 (Ky. 2008), determined the property was bound by the restrictive covenants in the original developer's Declaration of Covenants, Conditions and Restrictions (despite being included by reference only in a subsequent chain of title); *Colliver v. Stonewall Equestrian Estates Assiation*, 139 S.W.3d 521 (Ky. App. 2003), upheld a recorded restrictive covenant that was drafted and recorded by a later-dissolved developer (and despite previous inconsistent enforcement of the covenants by the homeowners' association); *KL & JL Investments, Inc. v. Lynch*, 472 S.W.3d 540 (Ky. App. 2015), found a property owner was bound by a restrictive covenant contained in the original, recorded development plan (despite receiving zoning approval to subdivide and a release of the covenant from the surviving grantor); *Oliver v. Shultz*, 885 S.W.2d 699 (Ky. 1994), (the only case Moore Property cited that did not enforce the restrictive covenant) found a restrictive covenant was not enforceable due, in part, because the restriction was not written in a recorded instrument for the property in question and therefore no notice was provided to subsequent purchasers.

The Maintenance Provision is not a recorded restrictive covenant; it is a contract provision from a mediation agreement about a possible, future restrictive covenant. Analysis of restrictive covenants and mediation agreements have consistencies: both fall within contract law and the intent of the parties is tantamount. *See Hensley*, 560 S.W.3d at 521-22; *see also Spot-A-Pot*, 278 S.W.3d at 161. However, recorded restrictive covenants and mediation agreements vary in their practical legal creation. Stated another way, mediation agreements are intended to plug holes in a sinking ship; recorded restrictive covenants are ships unto themselves that occasionally require judicial navigation. As legal practitioners know quite well, a mediation agreement does not contain every term of a contract with the exact, specific language intended.

> [I]t is noteworthy that frequently it is impossible to generate a formal settlement document at the mediation conference. While such is desirable and would avoid controversies such as that now before this Court, reason dictates that the final formal settlement agreement must be drafted upon the oral terms reached and informal notations made at the conclusion of the mediation conference. However, an oral settlement agreement is nevertheless binding and enforceable.

*Spot-A-Pot*, 278 S.W.3d at 161 (citation omitted).

As the Kentucky Supreme Court noted in a similar case concerning a settlement or mediation agreement, this case raises concerns of considerable significance for all practitioners, as to what constitutes a binding settlement

-9-

agreement. *See United States Liability Ins. Co. v. Watson*, 626 S.W.3d 569 (Ky. 2021). Against that backdrop, we turn to the Agreement herein.

While restrictive covenants often do not require extrinsic evidence for proper interpretation, mediation agreements, by their very nature, are meant to build upon previous agreements and result in subsequent agreements. This distinction does not always matter, but here, the distinction is useful on our hunt for the intention of the parties.

> [W]e first must determine whether the terms of the parties' settlement agreement are ambiguous because our resolution of the ambiguity question will dictate how our interpretive analysis will proceed. If an ambiguity exists, the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions.

*Frear*, 103 S.W.3d at 105-06 (internal quotation marks and citations omitted).

Here, a panel of this Court previously determined that the 2015 Mediation Agreement was not intended as a stand-alone document and did not include the entire agreement of the parties – *i.e.*, alone, it is ambiguous. *Moore Prop. Invs.*, 2020 WL 4515418, at *3. Therefore, we must look beyond the four corners of the document and consider – through extrinsic evidence – "the subject matter of the contract, the situation of the parties and the conditions under which the contract was written[.]" *Frear*, 103 S.W.3d at 106. In fact, our primary

-10-

objective is to effectuate the intentions of the parties. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002) (citation omitted).

Both parties argue that the value of their property is negatively affected if the Maintenance Provision is not interpreted their way. Fulkerson argues, "if these protective provisions were not to run with the land, any person or entity taking ownership of the property from Dr. Fulkerson would have 0% control over <u>any</u> of the common area expenses or the color of the building." She claims that failure to bind the Maintenance Provision to the land would make her unit "unmarketable." Conversely, Moore Property argues, "[i]f a restrictive covenant were placed on the property altering the larger unit's control, as does the maintenance provision contemplated by Fulkerson, the value of Moore Property's unit would diminish."

Additionally, the 2015 Mediation Agreement does not state explicitly if the Maintenance Provision runs with the land or if it terminates at Fulkerson's sale of Suite B. Moore Property argues the *lack* of language shows the parties' intent;[8] while Fulkerson argues the totality of the circumstances and actions of the parties show their intentions. On this point, we agree with Fulkerson.

---

[8] Moore Property argues 1) The 2009 Lease Agreement intentionally contained no reference to a restrictive covenant as to the common area elements; and 2) the 2015 Mediation Agreement contained no language to bind the Maintenance Provision to heirs, assigns, and/or subsequent purchasers.

-11-

In 2009, the parties negotiated a lease and Fulkerson retained an option to purchase Suite B. The original plan and/or understanding was that the property was or would be subdivided.[9] When Fulkerson initially tried to exercise her right to purchase, Moore Property was unable to provide clear title. A contentious relationship quickly ensued. After litigation, the parties moved toward the sale, but were unable to complete the sale documents. Moore Property wanted the property recorded as a condominium regime, but such a regime would effectively eliminate Fulkerson's control over the common areas. Fulkerson wanted to retain *some* control over the common areas.

Fulkerson argues that she only agreed to the change from subdividing the property to a condominium regime *if* the Maintenance Provision was included and her common area rights were tied to her unit (in order to maintain the value of the unit and prevent future buyers from being at the whim of Moore Property's unilateral common area decisions). Fulkerson argues she had no intention of giving up her rights to the common areas, especially considering Moore Property had threatened to abuse its control of the common areas if left unfettered.[10] Moore Property admits in its appellate brief, "[t]he division of the property pursuant to a

---

[9] The 2009 Lease Agreement does not include the word "condominium."

[10] Fulkerson argues that she was charged more than seven times the estimated expenses for the common area in 2010 and Moore Property threatened to paint "the entire property pink" if it chose to.

condominium regime was intended to settle a dispute between the parties and the maintenance provision was a compromise between them." Moore Property simply insists it was not binding on future purchasers. We do not agree.

As a matter of law, the Maintenance Provision is enforceable according to the agreed upon terms. The Maintenance Provision must be given permanency because the record reflects the parties intended a compromise: Moore Property could proceed with the condominium regime if Fulkerson received a unit with permanent voting rights (*i.e.*, some control over the common area). The parties recognized that subsequent documents would need to be prepared, but they were intending to reach a compromise in an effort to end this long and tortuous litigation. Sadly, it did not bring an end to the litigation, and we recognize that this ruling may not either. However, we conclude the Maintenance Provision runs with the land.

## IV. CONCLUSION

Accordingly, the order of the Jefferson Circuit Court is AFFIRMED.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE LAURA FULKERSON: |
|---|---|
| Jason C. Vaughn | Harold W. Thomas |
| Louisville, Kentucky | Louisville, Kentucky |