**O. P. LINK HANDLE COMPANY, Appellant,**

**v.**

**C. M. WRIGHT, Sr., et al., Appellees.**

Court of Appeals of Kentucky.

June 28, 1968.

T. E. Mahan, Williamsburg, for appellant.

J. B. Johnson, Sr., Johnson & Johnson, Williamsburg, for appellees.

PALMORE, Judge.

The appellant O. P. Link Handle Company (hereinafter Link), through its managing agent, Elbert Pike, contracted to buy some standing hickory timber from the appellees, C. M. Wright and wife, Dortha Wright. Shortly thereafter Pike learned that another company had a contract to remove the merchantable timber from the same property, and Link brought this suit in the Whitley Circuit Court to rescind its contract and recover $2000 paid the Wrights at the time of its execution. This court has sustained Link's motion for an appeal from a judgment dismissing its complaint. KRS 21.080; RCA 1.180.

On April 22, 1960, the Wrights entered into a contract by which they sold to W. E. Partin Lumber Company and Marshall Lumber Company [1] "all merchantable timber owned by the sellers * * * however, not to cover any timber 8 inches or less in diameter, 12 inches above the ground" standing on some 1200 to 1400 acres of land described as "a large boundary of land in Whitley County, Kentucky, a short distance from Rockhold, said lands being known as the Criscillis and Lay Land, the Boyd, Delaney and White lands, and usually thought of as being in three localities covering a mountain area back of the home of C. M. Wright, on Kentucky Highway 26, and extending across on the Corn Creek side of said Mountain and in an easterly direction by the way of Kernel Hollow over to the Rollins property on the Meadow Creek Section and being all the timber land owned by the Wrights in said section of Whitley County, title to which was acquired by them March 6, 1957, by deed recorded in Deed Book 192, Pages 136–139, in the office of the County Court Clerk of Whitley County, Kentucky."

The contract gave the purchasers the right "to freely move upon and about all of said premises of wooded lands" and "remain in peaceful possession for the purpose of manufacturing this timber for a period of not to exceed five (5) years. The Purchasers agree to use due diligence in cutting this timber and not to re-cut territory previously gone over during this period."

On May 24, 1961, Partin gave the Wrights a partial release in which it was recited that whereas the purchasers "have cut all merchantable timber that they care to cut from the Lay and Criscillis portion of the land, to top of the mountain only, * * * they now release to this portion [sic] their right, title and interest in and to that portion of the land and the timber thereon."

On May 2, 1962, the Wrights entered into the contract with Link which is the subject of this controversy. The Partin contract was not of record, but Pike and Wright spent two days going over the territory and Pike observed that some of it had been cut over.[2] The contract

---

1. Partin later purchased Marshall's interest in the contract.

2. Pike says he asked about this and Wright told him "that Mr. Partin had cut some of that for mine timbers or something like that that he needed a few trees." At the time Pike had never heard of Partin.

was prepared by Link's attorney, omitting the description. On the day it was signed Pike and Wright took it to a notary public, who inserted the description provided by Wright, as follows: "Description as shown on deed recorded in Deed Book #192 at Pages Nos. 136–139 inclusive (deed from Justin Potter and Edgar Rogers, and Dora [sic] F. Wright, wife of C. M. Wright, Sr.)."[3]

By the terms of this contract the Wrights sold Link "the sum of 250,000 feet of merchantable hickory timber which is useable [sic] in the buyer's business operation"[4] on the described lands and gave the buyer "full license and authority to enter upon the premises * * * and do all acts and things necessary to cut and remove the said trees and timber therefrom" for a period of five years. It was further provided that the buyer was to have "the exclusive right and option to cut and remove the balance of any portion thereof * * * remaining upon the within described lands after the removal of the initial 250,000 feet sold hereby, and "in the event additional hickory timber is cut and removed by the buyer, the same shall be paid for at the rate of $8 per thousand feet with measurement made by handle measurement as aforesaid. In the event that there is not sufficient merchantable hickory timber useable [sic] in the seller's business to fulfill the said 250,000 feet of timber sold and conveyed herein, then in that event reimbursement shall be made by the seller to the buyer at the rate of $8 per thousand feet for all shortage of timber under the said 250,000 feet conveyed hereby." .

Although the contract did not warrant the existence of 250,000 feet of hickory on the described property, and provided specifically for a refund of $8 per thousand in the event of a shortage, it contained no reference to the Partin contract and placed no condition or qualification on Link's

"full license and authority" to enter upon the premises (all the premises) and do all things necessary to cut and remove the hickory timber, or upon Link's "exclusive right and option" to cut and remove whatever remained after removal of the initial 250,000 feet. Yet at the time it was signed Partin had three more years in which to remove all of the merchantable timber, including hickory, standing on that portion of the territory not theretofore cut over.

Pike began to work on the cut-over area and removed one load of timber. On the next day his timber cutter discovered from a man he sought to hire as a logger that "you ain't got no timber up there, son, to cut," because it had been sold to Partin. Pike went to see Partin, saw his contract, and immediately contacted Wright. Wright took the position that the contract entitled Link to get only such hickory timber as was standing after Partin had cut over the area. In other words, he contended that Link was to follow after Partin and take whatever usable hickory Partin saw fit to leave. The Wrights' defense to Link's complaint is, in substance, that regardless of what the contract says, that was the real agreement and it has not been breached. Link denies that this was the understanding and relies on the parol evidence rule, under which the terms of an unambiguous contract cannot be varied by extrinsic evidence. Cf. Gibson v. Sellars, Ky., 252 S.W.2d 911, 913, 37 A.L.R.2d 1435 (1952).

■ Link's complaint pleaded the two contracts as exhibits. It alleged also that Link was unaware of the Partin contract and that the Wrights had fraudulently concealed its existence. Though we are of the opinion that the complaint stated a cause of action without regard to the fraud allegation, and that Link's recovery does not depend on fraud, it is necessary to discuss the subject because the Wrights

---

3. It is conceded that this description, as written, covers the same property as the Partin contract.

4. Pike testified that Link could not use anything smaller than the 8-inch timber covered by the Partin contract.

treat it as a major issue in their brief. They say that Link's motion for appeal in this court contains the statement, "No fraud is claimed in the case now under consideration," and that this statement amounts to a judicial admission which destroys the keystone of Link's case. The statement is taken out of context. It follows quotation of a headnote from Gibson v. Dupin, Ky., 377 S.W.2d 585 (1964), reading, "Party is bound by his contract and ignorance of its import is no defense in absence of fraud." The obvious meaning of the remark, "No fraud is claimed," is that *the Wrights,* both of whom said they read and understood the contract before they signed it, were not claiming that *they* had been defrauded.

Although the contract between Link and the Wrights specified 250,000 feet of hickory, for which Link paid $2,000, the provisions for adjustment at the rate of $8 per thousand in the event of an overage or shortage make it clear that the figure of 250,000 feet was merely an estimate. The vital feature of the contract was not how much hickory was there, but the fact that *whatever was there* was sold to Link, with five years to get it out. Unfortunately, most of it already belonged to Partin, so the essential ground for relief presented by the complaint is failure of consideration, regardless of whether it was attended or compounded by fraud.

W. E. Partin testified that by the time the Link contract was made he had cut over about 200 or 300 acres. Others estimated the cut-over area at 300 to 400 acres. Under any view of the evidence the territory left yet to be gone over by Partin, and the quantity of hickory in it, was substantial. A substantial failure of consideration ordinarily justifies rescission. 17 Am.Jur.2d 978 (Contracts, § 502).

The evidence conflicts on the question of whether Pike, Link's agent, knew or should have been aware that the timber on the territory not already cut over at the time he inspected it had been sold to a prior purchaser. Again, however, we come to the parol evidence rule. The only possible effect of such information would be to alter the terms of the written contract, by showing that the parties understood Link's rights thereunder to be subject to something not mentioned in it. In short, Link's notice of Partin's contract could be relevant only if it were permissible to show that the contract was different from what it said, by proving an exception which the parties neglected to insert in the written instrument. As we understand the parol evidence rule, that is the precise maneuver it is designed to prevent.

Among the authorities cited by the Wrights is Hogg v. Frazier, 24 Ky.Law Rep. 930, 70 S.W. 291 (Ky.1902), in which it was held that one who buys standing trees with notice of a prior sale is not an innocent purchaser for value. That, however, was a suit by the first buyer against the second, not an action by the second buyer against the seller. Likewise, Turner v. McIntosh, Ky., 379 S.W.2d 470 (1964), was an action between a buyer with an unrecorded deed and a subsequent buyer with notice of the prior conveyance. Carter v. Quillen, 239 Ky. 583, 39 S.W.2d 1012 (1913), is distinguishable in that the description itself contained words of reference to a prior instrument in which certain exceptions and reservations had been made, and which therefore became a part of the description of what was being sold and conveyed to the complaining purchaser. We have no such reference in this contract. Haag v. Dixon, 151 Ky. 768, 152 S.W. 930 (1913), tends more to support Link than it does the Wrights, because it was there held that a party who took an option to buy land with knowledge that an infant owned an interest in it was "not in a position to demand that the court * * * modify the option" by requiring the optionors to convey the property with a provision to protect him against the outstanding claim of the infant, or by requiring them to accept less than the contract price. The optionee's suit was for

specific performance, and the court held that he could elect to pay the contract price and take what the optionors, owned, but the court could not make a new contract with a different price from the one provided in the option agreement. Applying that principle to this case, and assuming this were a case in which the remedy of specific performance would be authorized, if Link wanted specific performance it would have to take what hickory timber was left by Partin. But that, of course, is not the remedy sought, and the *Haag* case has no relevance here except insofar as it holds that the court will not make a new contract for parties who have made a bad contract with their eyes open.

■ And so on. Perhaps the best way to summarize our position on this phase of the argument is to illustrate. If A does not own what he purports to sell to B and accepts B's money for it he is unjustly enriched, and to the extent of such enrichment is liable in an action for restitution. Cf. Corbin on Contracts § 1108 (Vol. 5, p. 579). The enrichment is none the less unjust by reason of what A and B knew or should have known about the condition of A's title. The plain fact is that A has received something for nothing at the expense of B, who may have been naive but certainly did not intend it as a gift. In this particular instance it makes little difference whether the action be labelled restitution or rescission. It comes out the same either way.

Another proposition argued by the Wrights is that since the law allows extrinsic proof to show the real consideration as distinguished from that which is recited in the contract, it should follow that other variations from the terms of the agreement may be proved. In support of that proposition they cite McNeill's Adm'x v. Riley, 256 Ky. 170, 75 S.W.2d 1068 (1934), and analogous cases. That decision, however, points out that the principle allowing the true consideration to be shown is an exception to the parol evidence rule,

expressly provided or recognized by statute. Cf. KRS 371.030.

"It is true that a contemporary oral agreement inconsistent with a written contract, cannot be relied on in the absence of an allegation of fraud or mistake * * and that evidence of a verbal agreement is not admissible to vary or contradict the terms of a note containing an unconditional promise to pay * *. * but the rule does not apply to the consideration stated in a written contract. On the contrary, we have a statute providing that the consideration of any writing * * * may be impeached or denied * * * and we have uniformly ruled that under this section the true consideration of a deed, without an allegation of fraud or mistake, may be shown by parol, although it contradicts the written instrument." McNeill's Adm'x v. Riley, 256 Ky. 170, 75 S.W.2d 1068, 1070 (1934).

In closing, it might be well to add that both Pike and Wright were experienced men. We quote, for example, from Wright's testimony under cross-examination:

Q—"You don't know much about timber, do you?"

A—"I know enough to know what I'm doing."

Q—"And you knew what you were doing when you signed the contract?"

A—"Yes."

Q—"You said you read it and understood it?"

A—"Yes."

Q—"You felt there was no restrictions at all when you signed and swore to that contract—you had read it and you have heretofore testified that you understood every word in it?"

A—"I sold him what I owned."

* * * * * *

Q—"I'm asking you now, Mr. Wright, and I am insisting that you answer my question—did you or not read this contract and understand it at the time you signed it?"

A—"Yes."

In their answer the Wrights alleged, among other things, "that a mistake as to the intent of the parties was made in the execution of the contract, and that same was not drafted in accordance with the prior negotiations between the parties, and that said contract should be modified by this court to express the intent of the parties." They did not, however, plead a counterclaim. And again, it seems to us that the claim of mistake, if allowed to defeat Link's cause of action, would defeat the parol evidence rule as well. If that rule is to have any real meaning, it must apply to this case.

The so-called parol evidence rule has numerous exceptions, or perhaps it should be said that there are many situations to which it might seem to be applicable but is not. Indeed, from a reading of Corbin (Ch. 26, Corbin on Contracts), it would appear that in other jurisdictions the rule itself has been shot to pieces and scattered to the four points of the compass. But we like it. We concede that there are some kinds of mistake to which it ought not be held applicable. But when two intelligent parties have read the contract before signing it, and one thereafter says it meant something different, or was subject to some unexpressed condition, reservation, limitation, proviso, or understanding, but the other says it meant just what it said, no more and no less, it is our opinion that stability and a salutary confidence in the written word requires the instrument itself to prevail.

"Under the guise of interpretation, courts are repeatedly importuned to give a meaning to the writing under consideration which is not to be found in the instrument itself, but which is based entirely on direct evidence of intention. And just as steadfastly, the courts [this court, at least] reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make." Williston on Contracts, Third Edition, § 610A (Vol. 4, p. 513).

The chancellor's basic factual finding was "that the plaintiff had knowledge and actually saw that the area had been cut over," and his judgment against Link was drawn from legal conclusions that may apply in true cases of fraud and deceit but which we hold inapplicable to this case.

The cause is reversed with directions that a judgment be entered in favor of the appellant.

All concur.