RENDERED: FEBRUARY 9, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0146-MR

RYAN FEIDER, CHRISTINA HOSTETLER,
JASON HOSTETLER, DOUGLAS KEEN,
JOANNE KEEN, DAVID THOMAS MITCHELL,
SARAH MITCHELL, LAUREN TINKER,
RICHARD J. TINKER, AND ROBERT M. TYRRELL,
INDIVIDUALLY AND AS THE TRUSTEE OF
THE ROBERT M. TYRRELL REVOCABLE
LIVING TRUST                                                APPELLANTS

|  | APPEAL FROM EDMONSON CIRCUIT COURT |
|---|---|
| v. | HONORABLE CHRISTOPHER T. COHRON, JUDGE |
|  | ACTION NO. 21-CI-00069 |

PEGGY STURDIVANT, BARBARA ALLEN,
DOUGLAS ALLEN, DECEASED, DANNY
HOLLIDAY, TAMMY HOLLIDAY, HONACRES, L.L.C.,
BARRY JOHNSON, CATHY JOHNSON, AND WILLIS
STURDIVANT                                                    APPELLEES

AND

NO. 2023-CA-0153-MR

HONACRES, LLC                                                    APPELLANTS


                    APPEAL FROM EDMONSON CIRCUIT COURT
v.            HONORABLE CHRISTOPHER T. COHRON, JUDGE
                         ACTION NO. 21-CI-00069



PEGGY STURDIVANT, BARBARA ALLEN,
DOUGLAS ALLEN, DECEASED, RYAN FEIDER,
DANNY HOLLIDAY, TAMMY HOLLIDAY,
CHRISTINA HOSTETLER, JASON HOSTETLER,
BARRY JOHNSON, CATHY JOHNSON, DOUGLAS
KEEN, JOANNE KEEN, DAVID THOMAS MITCHELL,
SARAH MITCHELL, WILLIS STURDIVANT, LAUREN
TINKER, RICHARD J. TINKER, AND ROBERT M. TYRRELL,
INDIVIDUALLY AND AS THE TRUSTEE OF THE
ROBERT M. TYRRELL REVOCABLE LIVING TRUST
                                                                  APPELLEES

                              OPINION
                             AFFIRMING

                          ** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ECKERLE AND KAREM, JUDGES.

ECKERLE, JUDGE:  The main issue in this case is:  do short-term rentals

("STRs") of single-family houses in a small, gated, lake-house subdivision violate

a deed restriction prohibiting commercial uses?  The Trial Court found a violation,

granted summary judgment, and entered an injunction.  After our thorough *de novo*

review of the deed restrictions, we agree that STRs are prohibited commercial

uses.  Hence, we affirm.

# BACKGROUND

Moutardier Bluffs is a small, deed-restricted and gated subdivision of fewer than 50 houses located near Nolin Lake in Edmonson County, Kentucky. Its development is of recent vintage. The developer, HonAcres, Inc. ("HonAcres") executed deeds of restrictions for the community in 2008 (the "2008 Restrictions") and again in 2010 ("2010 Restrictions"). There is little material difference between the 2008 Restrictions and the 2010 Restrictions. The main deed restrictions relating to this case are that each lot must contain only a single-family house, and no lot may contain commercial uses.

HonAcres then recorded a final plat for the subdivision, which on its face listed the same deed restrictions. The lots were then sold and developed. Approximately a decade into its development, more than 75 percent of the lots were sold. While a few of the purchased lots remain empty, the constructed lots only contain single-family residences. This 75-percent threshold triggered one of the deed restrictions, which called for the developer's powers and responsibilities under the deed restrictions to be transferred to a to-be-formed homeowners' association.

Prior to this triggering event, the evidence in the record indicates that some lot owners operated STRs in the community. Additionally, HonAcres informed some, but not all, lot owners prior to purchase that STRs were allowed.

It appears that many, if not all, of the Appellees in the instant case were to some degree aware of the STRs before they purchased homes or lots. Some Appellees even used the STRs at various times and encouraged extended family members to use the STRs. Several "nuisances" had allegedly occurred at the STRs, including firework usage by patrons, excessive parking that overflowed onto the subdivision's narrow road, people walking around the community while wearing hoodies, people stealing firewood, and strangers being given the code to the subdivision's gate.

Based in part on the issues some lot owners had with the STRs, whether or how STRs would be allowed in the community became a contentious issue during the attempted formation of the homeowners' association, with the lot owners having difficulties agreeing to by-laws for the homeowners' association.

HonAcres, believing it had the authority to amend the 2010 Restrictions, attempted to put the issue to rest. Prior to a scheduled lot-owners meeting, HonAcres executed and recorded what purported to be amendments to the deed restrictions ("2021 Amendments"). Among other changes to the 2008 and 2010 Restrictions, the 2021 Amendments expressly permitted STRs. HonAcres claimed it had authority as the developer to amend the deed restrictions because one of the deed restrictions permitted it "final say" over any disputes about the deed restrictions.

Following the 2021 Amendments, the scheduled meeting about the homeowners' association was canceled. Several homeowners who were not operating STRs ("Non-STR Lot Owners") brought suit against fellow lot owners who were operating STRs in the subdivision ("STR Lot Owners"). The Non-STR Lot Owners also brought suit against HonAcres. The Non-STR Lot Owners claimed certain deed restrictions prohibited STRs in the subdivision. Specifically, one of the deed restrictions prohibited any lot from being "used for commercial use." The Non-STR Lot Owners sought an injunction prohibiting STRs from being operated within the subdivision.

Following almost two years of litigation, discovery, and the filing of multiple depositions in the record, the Trial Court found operating STRs in the community violated the deed restrictions, granted summary judgment in favor of the Non-STR Lot Owners, and entered an injunction prohibiting further STR uses in Moutardier Bluffs. HonAcres and STR Lot Owners appeal.

**STANDARD OF REVIEW**

The appeal submitted to us is from a grant of summary judgment, and appellate review of the same has been long-established:

> The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The trial judge must view the evidence in a light most

favorable to the nonmoving party, resolving all doubts in its favor. Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions.

*Bruner v. Cooper*, 677 S.W.3d 252, 269 (Ky. 2023) (citing *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010)).

Additionally, "[i]nterpretation or construction of restrictive covenants is a question of law subject to *de novo* review on appeal." *Hensley v. Gadd*, 560 S.W.3d 516, 521 (Ky. 2018) (citing *Triple Crown Subdivision Homeowners Ass'n, Inc. v. Oberst*, 279 S.W.3d 138, 141 (Ky. 2008)). Using these well-established standards, we proceed to our *de novo* review.

## ANALYSIS

We have grouped together the issues raised on appeal by HonAcres and the STR Lot Owners into five general questions, each addressed separately below.

### I. Do the Moutardier Bluff deed restrictions prohibit STRs?

The short answer to this question is, "yes."

Because deeds of restrictions are each unique creations, they must be decided on their own merits and "construed according to their plain language." *Hensley*, 560 S.W.3d at 521 (citing *Robertson v. W. Baptist Hosp.*, 267 S.W.2d

395, 397 (Ky. 1954)).  Deeds of restrictions are contracts that are interpreted as such, and "[o]ne primary rule of construction relating to all instruments is that every part of the instrument will be given meaning and effect when possible." *McFarland v. Hanley*, 258 S.W.2d 3, 5 (Ky. 1953).

In Kentucky, we follow two guiding principles for interpreting deed restrictions.  First, we analyze the language in the written instrument unless there is some patent ambiguity.  *Brandon v. Price*, 314 S.W.2d 521, 523 (Ky. App. 1958) ("[T]he language actually used in the declaration of restrictions, when considered with the plat with which the restrictions are identified, is not so ambiguous as to permit resort to extraneous evidence.").  As our Supreme Court recently summarized:

> . . . courts are not to remake contracts for parties and create ambiguity where none exists.  *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968).  In *O.P. Link*, we admonished against giving a writing meaning which is not to be found in the instrument itself under the guise of interpretation based on direct evidence of intention.  *Id*. (citing 4 Williston on Contracts, § 610A (3d ed. 1961)).  Parties are bound by the clear meaning of the language used, the same as any other contract.  *See Larkins v. Miller*, 239 S.W.3d 112, 115 (Ky. App. 2007) (stating that "a court should interpret the terms of the contract according to their plain and ordinary meaning[]").

*Hensley*, 560 S.W.3d at 522.

Second, whether our analysis is confined to the written documents or, in the case of ambiguity, expanded to include extraneous evidence of the general scheme of the subdivision, we attempt to ascertain and give import to the intention of the parties creating the restrictions. *Id.* at 521. We view restrictions as a protection for the property owner and the public, and we no longer follow a doctrine of strict construction. *Id.* (citing *Oberst*, 279 S.W.3d at 140). Said another way:

> As a general proposition it may be said that, when building restrictions first came into use, they were looked upon as restrictions against the individual owner of property and were scrutinized carefully to avoid the untrammeled use of real property. In recent years, however, they have come into rather general use in metropolitan areas and are looked upon more in the nature of a protection to the property owner and the public rather than a restriction as to the use of property.

*Dorsey v. Fishermen's Wharf Realty Co.*, 306 Ky. 445, 449, 207 S.W.2d 565, 567 (1947). *See, e.g.*, *Brandon*, 314 S.W.2d at 523 (rejecting the strict-construction claim "that a restriction against two houses on one lot can be enforced only if clearly and specifically expressed[,]" and, instead, interpreting "the phrase 'all lots shall be used for private single family residence purposes'" to mean "that only one private single family residence shall occupy each lot").

When interpreting the restrictions, we seek to determine the intention of the grantor from the language used, "considered in light of such factors as the

-8-

general scheme of the subdivision." *Hensley*, 560 S.W.3d at 522 (internal quotation marks omitted). As quoted above, "courts are not to remake contracts for parties and create ambiguity where none exists." *Id.* (citing *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968)). The parties are "bound by the clear meaning of the language used, the same as any other contract[,]" as we will not give "a writing meaning which is not to be found in the instrument itself under the guise of interpretation based on direct evidence of intention." *Hensley*, 560 S.W.3d at 522 (citations omitted).

In sum, if what the grantor wrote in the deed of restrictions is of "plain import[,]" then "[w]e may not substitute what the grantor may have intended to say" with consideration of external factors. *Mascolino v. Noland & Cowden Enters., Inc.*, 391 S.W.2d 710, 712 (Ky. 1965) (cited by *Hensley*, 560 S.W.3d at 521-22).

Here, the Trial Court found the deed restrictions were unambiguous and prohibited STRs. Having reviewed the restrictions and our Supreme Court's holding in the recent and seminal case of *Hensley*,[1] we are compelled to agree.

---

[1] HonAcres and STR Lot Owners claim *Hensley* is not controlling, arguing that we should follow an older, not-to-be-published case from our Court. Notably, the *Hensley* Court called into doubt the holding in that not-to-be-published case. 560 S.W.3d at 525 ("Irrespective of the correctness of that conclusion . . . ."). We do not wade too deep into whether we should apply a not-to-be-published opinion to the instant case, as our analysis, *infra*, demonstrates that *Hensley*'s holding controls the instant case.

-9-

The *Hensley* Court concerned a similar fact pattern to the instant case. There, a dispute arose over whether STRs were permitted in a lakeside development. The development had a deed of restrictions requiring certain lots to contain single-family residential structures and have only residential uses. 560 S.W.3d at 518-19. One specific lot in the community, however, was permitted to have residential uses or certain, listed commercial uses, including usage as a hotel. *Id*. at 519. The deed of restrictions further specified, "No trade, business, or profession of any kind shall be carried out upon any residential lot nor shall anything be done thereon which may become an annoyance or a nuisance to the neighborhood[.]" *Id*. The restrictions did permit residential structures to have signage indicating the "sale or rental thereof[.]" *Id*.

One lot owner then began renting one of the residential-use lots as an STR. A lawsuit ensued, and the parties ultimately requested the Trial Court to try the case on depositions. CR[2] 43.04(1). The Trial Court then entered an order finding the restrictions were unambiguous and prohibited STR use. *Hensley*, 560 S.W.3d at 520. On appeal, a panel of our Court reversed, holding in relevant part that the deed restrictions were ambiguous, and because "in case of doubtful meaning, restrictions should be construed in favor of the free use of property[,]" the STR use was not prohibited. *Id*.

---

[2] Kentucky Rules of Civil Procedure.

The Kentucky Supreme Court granted discretionary review and reversed. The Court ultimately held that the restrictions in *Hensley* were unambiguous and prohibited STRs.

To arrive at this conclusion, the Court in part contrasted the commercial uses permitted on the one specified lot, which included hotel uses, with the residential-use-only restriction on the remaining lots. *Id*. at 522-23. With hotels being clearly labeled as commercial uses, the Court compared STRs to hotels and made two pertinent conclusions: (1) the STR in *Hensley* ostensibly operated in the same manner as a hotel, thus constituting a commercial use; and (2) those staying in an STR do not constitute "residents," thus violating the residential-use-only deed restriction. *Id*. at 523-24.

In light of *Hensley*'s analysis of similar deed restrictions and STRs, we conclude that the 2010 Restrictions are unambiguous and prohibit STRs. The 2010 Restrictions collectively demonstrate an intention to create a small, gated, single-family residential neighborhood that prohibits all commercial activity, including STRs. We begin with the deed restriction in paragraph 4, "No lot shall be used for commercial use."

Given *Hensley*'s strong conclusion that STRs are occupied by non-residents, operate similarly to hotels, and constitute commercial uses, the STR Lot Owners are clearly violating paragraph 4 of the 2010 Restrictions. As the Court in

-11-

*Hensley* held, operating a single-family residence as an STR can "meet[] the very statutory definition of a hotel: a 'building or structure kept, used, maintained, advertised, or held out to the public as a place where sleeping accommodations are furnished to the public.'" 560 S.W.3d at 524 (quoting KRS 219.011(3)). Such single-family STR use may even require the operator to register as a hotel and to remit corresponding tax collection on the rental monies. *Id. See also* KRS 139.200(2)(a); and KRS 142.400(2).

The STR Lot Owners in the instant case are operating much in the same fashion as the STR in *Hensley*. The STR Lot Owners post their rentals on popular vacation-rental websites. They offer nightly and weekly rates for vacationers. They employ cleaners and maintenance persons to keep the facilities clean and functioning for their patrons. At least one STR Lot Owner has remitted some "Transient Room Taxes" on the rental income. And the STRs are clearly operating for profit, with some of the STRs generating a net profit, and others generating enough revenue to cover the mortgage and maintenance costs. We are bound to follow the holding in *Hensley*, Supreme Court Rule 1.030(8)(a) ("The Court of Appeals is bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court."); thus, we must conclude that STR usage of single-family structures in Moutardier Bluffs is a

-12-

commercial use akin to operating a hotel. Accordingly, the STRs operating in Moutardier Bluffs constitute commercial uses.

But our analysis does not end there. HonAcres and STR Lot Operators argue that the commercial-use restriction in paragraph 4 is ambiguous and, when read with the entire 2010 Restrictions, should not be viewed as so broad that it encompasses STR usage. While we agree that we must examine the entirety of the 2010 Restrictions, we find no ambiguity in paragraph 4's restriction as it relates to STR usage. Moreover, a careful examination of the 2010 Restrictions as a whole demonstrates an intent to prohibit STRs in this small, gated, lake-house community.

First, STRs violate paragraph 1 of the deed restrictions, which requires the community to consist of "*residential* lots for single family houses" (emphasis added). Though the outward appearances of these STRs are single-family homes, the lots are not being used as *residential* lots because they are not occupied by residents. As our Supreme Court held, short-term tenants who occupy STRs "cannot be considered 'residents' within the commonly understood meaning of that word, or the use by such persons as constituting 'residential.'" *Hensley*, 560 S.W.3d at 524. Paragraphs 5 and 6 of the 2010 Restrictions further bolster this conclusion. Those paragraphs refer to "residence" and "[r]esidential dwelling." In other words, this subdivision is intended to be residential, not commercial, and

each lot is to be used and occupied by residents.  *Cf. Brandon*, 314 S.W.2d at 523 ("[T]he phrase 'all lots shall be used for private single family residence purposes' means that only one private single family residence shall occupy each lot.").

HonAcres argues against this interpretation, claiming the words "residential" and "houses" in paragraph 1 are broad and ambiguous and do not necessarily only require residential uses on the lots.  Specifically, HonAcres notes that "house" has been interpreted broadly in Kentucky law, to wit, "It has been said that 'house' is all inclusive and may include any and every kind of structure, depending upon the context in which it is used and the purpose sought to be effected."  *Dartmouth-Willow Terrace, Inc. v. MacLean*, 371 S.W.2d 937, 939 (Ky. 1963) (citation omitted).  Additionally, HonAcres notes the word "residence" can connote a permanent or temporary structure, as paragraph 5 specifically prohibits temporary, residential structures.  Both arguments fail.

First, *MacLean* reinforces that the intention of the 2010 Restrictions is to create a community solely consisting of single-family houses.  In *MacLean*, deed restrictions permitted the lot owner to construct a "house, which shall . . . be for residence purposes only."  371 S.W.2d at 938 (ellipses in original).  The lot owner wanted to build a multi-family apartment building, arguing the same aligned with the broadly-worded restrictions.  Though the holding ultimately rested on a change in the nature of the community since the deed restrictions were enacted, the

-14-

*MacLean* Court noted that an apartment house should be permitted as "it would have been easy to so word the restriction" to permit only single-family houses. Here, the 2010 Restrictions follow *MacLean*'s caution and explicitly limit this community to single-family houses. Furthermore, *MacLean*'s dicta liberally interpreted "house" and "residence" to include multiple types of residential structures; similar liberal interpretation of the term "commercial" in the 2010 Restrictions leads us to conclude STR is a commercial use.

Moreover, HonAcres's argument regarding paragraph 5 of the 2010 Restrictions further strengthens the conclusion that STRs are prohibited. Paragraph 5 specifically prohibits using "structures of a temporary character" as residences, and it prohibits using basements or certain temporary structures as residences. These prohibitions reinforce: (1) that the community is for long-term residents; and (2) the lots are for single-family use, not transient tenants. STRs violate both of these principles: they are, by definition, for short-term or temporary occupancy; and they are occupied by transient tenants.

There are other restrictions that further support the long-term, single-family, residential – and not commercial – nature of the community. For example:

16. No more than two dogs or two cats shall be permitted per household and they shall be confined to the owners' lot. Any outside dwelling pet shall be controlled by leash or pen. No fowl, livestock or any other animals shall be permitted.

-15-

This paragraph describes the occupants of a lot as a "household." A "household" connotes family units, residents, and people living together under the same roof. *See, e.g.*, *Lynch v. Commonwealth*, 74 S.W.3d 711, 713 (Ky. 2002) (citation omitted) (interpreting "household" in KRE[3] 504 to mean a residence, a place where one resides, and "a 'factual place of abode or living in a particular locality'"); *Kentucky Farm Bureau Mut. Ins. Co. v. Gray*, 814 S.W.2d 928, 929 (Ky. App. 1991) (citation omitted) ("In Kentucky, the term 'household' has, for insurance purposes, been generally defined as 'persons dwelling together as a family under the same roof.'"); and *Sutton v. Shelter Mut. Ins. Co.*, 971 S.W.2d 807, 808 (Ky. App. 1997) (collecting definitions of "household" in insurance contracts, noting the term is synonymous with "family" and generally means those who dwell together under the same roof). The transient tenants of STRs are not dwelling or residing together, nor are they necessarily even of the same household.

Continuing, paragraph 17 of the deed restrictions states, "17. No animals are to be raised for commercial purposes on said property." This restriction demonstrates how extreme the commercial use restriction was intended to be. *Accord Hensley*, 560 S.W.3d at 522 (permitting certain commercial uses on one lot in a subdivision). Of the two dogs or two cats permitted per household, not even one of them can be an animal that the family is raising to sell commercially.

---

[3] Kentucky Rules of Evidence.

-16-

If there were any ambiguity in paragraph 4 about whether any types of commercial use were permitted, paragraph 17 lays that ambiguity to rest.

Finally, paragraph 15 demonstrates the intention to keep the subdivision as a quiet residential respite, providing that "[n]o noxious or offensive activities shall be carried out upon any lot, nor shall anything be done thereupon which may be an annoyance or nuisance to neighboring lot owners." Moreover, the use of the term "neighboring" as opposed to "adjacent" or "nearby" indicates familiarity between the lot owners. Operating an STR with a revolving-door of transient tenants flies in the face of the quiet, neighborhood community described in this deed restriction.

In sum, these deed restrictions are not ambiguous. They describe an undisturbed, single-family, residential, lake house neighborhood filled with only residential lots containing residential uses by long-term residents in households. STRs are commercial uses that allow temporary, transient, non-residents and, often times, non-households, to use the lots. Viewed as a whole, the deed restrictions unambiguously prohibit STRs.

To counter these unambiguous terms, STR Lot Owners point to the facts borne out in the depositions and affidavits of the Non-STR Lot Owners and HonAcres. Specifically, STR Lot Owners claim the Non-STR Lot Owners "contradict their claims in this case" because they admitted to personally renting

-17-

one of the houses within Moutardier Bluffs. Appellant STR Lot Owners' Brf. at 12. Additionally, the developer "confirms that the commercial use restriction does not apply to short-term rentals" because it admitted that it informed some parties prior to purchase that STRs were permitted. *Id*. This argument goes toward a waiver of the commercial use restriction due to arbitrary enforcement of covenants, *see, e.g.*, *Colliver v. Stonewall Equestrian Estates Ass'n, Inc.*, 139 S.W.3d 521, 525 (Ky. App. 2003), which is not the focus of our inquiry into whether the deed restrictions themselves are facially unambiguous and prohibit STRs. Moreover, HonAcres's *ex post facto* statements of what it intended to restrict when drafting the deed of restrictions likewise do not hold, as "this court may not substitute what the grantor may have intended to say for the plain import of what he said." *Id*. (cleaned up and citations omitted).

Because the deed restrictions on their face unambiguously describe an intention for Moutardier Bluffs to be a residential subdivision comprised of long-term, single-family households that operate no commercial uses at all, the deed restrictions prohibit any home from operating a STR. Accordingly, the Trial Court properly granted summary judgment in favor of the Non-STR Lot Owners on this issue.

## II. Did HonAcres have the authority to amend the restrictive covenants?

The short answer here is "no."

HonAcres argues that paragraph 22 grants it authority to amend the deed restrictions. That paragraph provides, "If at any time there is a dispute over these restrictions, the developer shall have the final say." Non-STR Lot Owners argue this restriction does not permit the developer to amend the deed restrictions. Instead, Non-STR Lot Owners argue that this restriction should apply only to permit the developer final say in conflicts on the restrictions that explicitly reserved discretion to the developer, *i.e.*, paragraph 3's prohibition against more than one detached building "unless otherwise determined by developer." We agree that the restriction does not explicitly permit amendments to the deed restriction.

Initially, we note that deeds of restrictions are contracts that "are to be construed according to their plain language." *Hensley*, 560 S.W.3d at 521. These contractual restrictions are "'mutual, reciprocal, equitable easements of the nature of servitudes in favor of owners of other lots of a plot of which all were once a part[,]'" and "'they constitute property rights which run with the land so as to entitle beneficiaries or the owners to enforce the restrictions[.]'" *Id.* (quoting *Ashland-Boyd Cnty. City-Cnty. Health Dep't v. Riggs*, 252 S.W.2d 922, 925 (Ky. 1952)).

The plain language here does not explicitly or implicitly grant HonAcres authority to amend the deed restrictions. It only permits "final say" when there is a "dispute over these restrictions[.]" The use of the term "final say" implies that at least one other party has some say in how the restriction applies. *Cf. Cameron v. Beshear*, 628 S.W.3d 61, 75 (Ky. 2021) ("[E]ven though a legislative committee may find that a regulation is 'deficient,' . . . the executive branch retains final say as to administrative regulations[.]"). Moreover, the term "final say" implies at best power to make a yes/no decision, not the authority to amend the contract. *Cf. Lofton v. Fairmont Specialty Ins. Managers, Inc.*, 367 S.W.3d 593, 596 (Ky. 2012) ("The contract stated that Maxey had the final say in whether to accept a settlement offer. . . . When a settlement offer was made, Lofton and Maxey disagreed about whether to accept it. Lofton voluntarily withdrew from representation when Maxey refused the offer."). In other words, if a lot owner asks permission to build a ranch-style house, HonAcres's "final say" authority permits it to say "yes" or "no" to the plan; HonAcres cannot instead dictate that the lot owner build a cape-cod style house.

Thus, application of "final say" to the instant case essentially grants lot owners the authority to request permission for certain items and HonAcres authority to affirm or deny those requests. Here, the deed restrictions permit lot owners input by choosing styles, designs, or sizes of houses being constructed.

The developer then has final say over these choices. There are numerous such deed restrictions in the document, including:

> 2. All structures shall be constructed with exteriors approved by developer.
>
> 3. Detached garages or storage buildings will be permitted if the design is approved by the developer. Only one detached building will be allowed per lot, unless otherwise determined by developer.
>
> . . .
>
> 7. Plans and specifications must be approved by the developer.
>
> . . .
>
> 9. The development shall also restrict the property owner from the parking of tractor-trailer trucks, heavy farm equipment (50 horsepower or less tractors for gardens and attachments are excluded), trailers, mobile homes, any manufactured housing, or any other use that would be unsightly to the neighborhood as determined by the developer.
>
> . . .
>
> 11. Any fencing shall not be installed beyond the front corner of the house and shall not exceed 6 feet in height. The fencing shall be maintained and painted or stained if constructed of wood materials in a manner to improve the character of the neighborhood.
>
> 12. Purchasers of these lots shall be responsible for installing adequate culvert tile and gravel to avoid damage to the road, ditch line, and grass.

13. It is the desire of the developer to preserve the natural vegetation of Moutardier Bluffs to the greatest extent possible and to preclude the cutting of trees unnecessarily. Therefore, no trees, shrubs or other vegetation shall be removed from any lot without approval from the developer.

14. Each lot owner will keep appearance of lot acceptable to developer.

The practical application of each of these deed restrictions highlights the authority given to HonAcres by paragraph 22. Under paragraph 2, a lot owner would submit construction design plans to a developer, who would then have "final say" per paragraph 22. Under paragraph 3, a lot owner would submit plans to construct more than one detached building on a lot, and the developer would then have "final say" regarding whether more than one detached building may be constructed. And so forth.

In some sense, paragraph 22 appears to be surplusage, as the language in other paragraphs impliedly indicates the developer already has final say. However, we note that paragraphs 11 and 12 contain situations where a lot owner has some say regarding how the lot is developed; yet they do not contain language indicating that the developer has final say. While not an issue before us, paragraph 22 would appear to apply to those deed restrictions.

Regardless, and as it pertains to the instant case, paragraph 22 does not explicitly or implicitly permit HonAcres to amend the deed restrictions.

Notably, the parties have pointed us to no Kentucky law that grants a developer implicit authority to amend deed restrictions unilaterally.

Accordingly, we agree with the Trial Court that summary judgment was appropriate on this issue. HonAcres has no authority to amend the 2010 Restrictions, and any purported amendments filed cannot change the commercial use prohibition to permit STRs.

### III. Did HonAcres' amendment of the restrictions materially change the character of the development?

We elect to not give an advisory opinion on this question.

HonAcres was without the authority to amend the restrictions. Accordingly, we need not decide whether the 2021 Amendments materially changed the character of the development. The 2021 Amendments, inasmuch as they altered the terms of the deed restrictions prohibiting commercial uses, exceeded the developer's authority. Accordingly, we affirm the grant of summary judgment on this issue.

### IV. Does the injunction contain sufficient specificity to be lawful?

The short answer to this question is, "yes."

HonAcres requests that we reverse and remand because the injunction allegedly lacks specificity for HonAcres to understand what is enjoined. The Order states in relevant part:

(2) Within thirty days of the entry of this Order, HonAcres shall send a certified letter to all current non-party owners, at their respective last known addresses, advising that short-term rentals are not permitted in Moutardier Bluffs.  Until such time as a homeowner's association is formed for Moutardier Bluffs, HonAcres shall advise all prospective purchasers and future owners that short-term rentals are not permitted in Moutardier Bluffs.  In the event HonAcres learns of any new short-term rentals, it shall promptly take action to ensure that any new short-term rentals cease operating.

HonAcres takes issue with the final sentence in the above paragraph. HonAcres claims ambiguity as there is no specific "action" it has been ordered to take in the event it learns of new STR.  Additionally, HonAcres argues that "promptly" is not a specific timeframe for said action.

Non-STR Lot Owners initially claim the issue is not properly preserved, as it was not raised in a CR 59 post-judgment motion.  Additionally, they argue that the order contains the requisite specificity.

We need not address whether the issue is properly preserved, as the injunctive language contains the required specificity.  CR 65.02(1) requires the language used in injunctions "shall be specific in terms and shall describe in reasonable detail, and not by reference to the complaint or other document, the act restrained or enjoined."  The purpose of CR 65.02 is to prohibit injunctions that are "too broad" or "too vague." *Commonwealth v. Mountain Truckers Ass'n, Inc.*, 683 S.W.2d 260, 263 (Ky. App. 1984) (citing *Fiscal Court of Jefferson County v.*

*Courier-Journal and Louisville Times Company*, 554 S.W.2d 72 (Ky. 1977)). The language in the rule exists "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Hensley*, 560 S.W.3d at 527 (internal quotation marks omitted).

The language here is neither too broad nor too vague to be understood. The term "promptly," while not denoting a specific period of time, is sufficient to put HonAcres on notice that it must not sit on information it receives about STRs in the community. Likewise, while the term "action" is facially broad, it must be read in light of the preceding sentence, which terminates HonAcres's duties under the injunction once a homeowners' association is formed. In other words, HonAcres's duty is to act as the homeowners' association and enforce the deed restriction prohibiting STRs. *See, e.g.*, *Triple Crown Subdivision Homeowner's Ass'n, Inc. v. Oberst*, 279 S.W.3d 138, 140 (Ky. 2008) ("[A] homeowners' association had standing to enforce restrictive covenants."). Notably, HonAcres has argued throughout the litigation that it has broad authority under the deed restrictions to settle disputes. Undoubtedly, it can determine appropriate actions to take against violative lot owners. Accordingly, we find no error in the Trial Court's injunctive language.

**V.    Was summary judgment prematurely granted?**

The short answer to this question is, "no."

As a final argument, STR Lot Owners claim summary judgment was prematurely granted before sufficient discovery was completed. They allege that they need additional time to depose one of the Non-STR Lot Owners, a homebuilder, and several Realtors. They claim the information in these depositions could prove that the Non-STR Lot Owners were aware of STRs occurring in the subdivision prior to their purchases of homes and lots. The Non-STR Lot Owners in turn argue that STR Lot Owners had sufficient time – more than a year – in which to conduct discovery. The Non-STR Lot Owners note that STR Lot Owners did not attempt to schedule the additional depositions in the time leading up to oral arguments on the summary judgment motion. Additionally, Non-STR Lot Owners argue that any additional information will not change the outcome of this case, which turns on the interpretation of the deed restrictions.

"It is a well established principle that a trial court has broad discretion over disputes involving the discovery process." *Sexton v. Bates*, 41 S.W.3d 452, 455 (Ky. App. 2001). Here, there was no abuse of discretion. STR Lot Owners had sufficient time to secure the additional deposition testimony. The issues in this case involve the interpretation of deed restrictions that are not ambiguous. The additional information sought would not alter the analysis.

"[T]he proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). The Trial Court properly terminated this litigation based on the facially-unambiguous deed restrictions. Accordingly, we decline to find error on this issue.

## CONCLUSION

In light of *Hensley*, we hold that this small, residential, single-family, lake house community that prohibits commercial uses in its deed restrictions necessarily prohibits STRs. Additionally, we hold that after an appropriate amount of discovery time had transpired, the Trial Court properly granted summary judgment in favor of the Non-STR Lot Owners. Finally, we hold that the injunction entered against HonAcres is sufficiently specific to comport with CR 65.02. Accordingly, we AFFIRM the order and injunction.

ALL CONCUR.

BRIEF FOR APPELLANTS RYAN
FEIDER, CHRISTINA HOSTETLER,
JASON HOSTETLER, DOUGLAS
KEEN, JOANNE KEEN, DAVID
THOMAS MITCHELL, SARAH
MITCHELL, LAUREN TINKER,
RICHARD J. TINKER, AND
ROBERT M. TYRRELL,
INDIVIDUALLY AND AS THE
TRUSTEE OF THE ROBERT M.
TYRRELL REVOCABLE
LIVING TRUST:

Jason C. Vaughn
Louisville, Kentucky

BRIEFS FOR APPELLANT
HONACRES, LLC:

Mark A. Smedal
Louisville, Kentucky

BRIEF FOR APPELLEES PEGGY
STURDIVANT, WILLIS
STURDIVANT, BARRY JOHNSON,
CATHY JOHNSON, AND
BARBARA ALLEN:

Colton W. Givens
Bowling Green, Kentucky