Don **COLLIVER** and Carolyn
Colliver, Appellants,

v.

**STONEWALL EQUESTRIAN
ESTATES ASSOCIATION,
INC., Appellee.**

No. 2002–CA–002096–MR.

Court of Appeals of Kentucky.

Dec. 5, 2003.

Rehearing Denied Jan. 30, 2004.

Discretionary Review Denied
Aug. 18, 2004.

Richard V. Murphy, Lexington, KY, for appellants.

Jeff A. Woods, Deanna L. Talwalkar, Wyatt, Tarrant & Combs, LLP, Lexington, KY, for appellee.

Before BUCKINGHAM, COMBS, and DYCHE, Judges.

## OPINION

DYCHE, Judge.

This matter is before the court regarding a dispute over the terms of restrictive covenants running with the land on Equestrian Estates, a residential development in Lexington, Kentucky.

Appellants Don and Carolyn Colliver bought property in this development in 1999 and wanted to build a detached two-car garage on their lot. Appellee, Stonewall Equestrian Estates Association, Inc., the homeowners' association of Equestrian Estates, voted against the Collivers' proposed garage two times in late 1999. On subsequent requests for approval in 2000, the Collivers were denied several more times.

The parties could not come to an agreement over the garage; nonetheless, the Collivers began constructing it in November of 2000. In response, the Association filed a complaint in Fayette Circuit Court seeking a permanent injunction and other relief on November 20, 2000. Although litigation was pending, the Collivers continued construction on the garage, and it was completed in the summer of 2001 at a cost of nearly $70,000.

The parties filed cross-motions for summary judgment after a short period of discovery. Following an inspection of the property and oral arguments, the circuit court granted summary judgment to the Association and ordered the garage to be removed from the property immediately. The Collivers appeal this order, or in the alternative pray that the circuit court be reversed as to remedy.

The fundamental rule in construing restrictive covenants is that the intention of the parties governs. *See Glenmore Distilleries v. Fiorella*, 273 Ky. 549, 554, 117 S.W.2d 173, 176 (1938). Hence, "the construction [of covenants] may not be used to defeat the obvious intention of the parties though that intention be not precisely expressed." *Ashland–Boyd County City–County Health Dept. v. Riggs*, Ky., 252 S.W.2d 922, 925 (1952) (citing *Connor v. Clemons*, 308 Ky. 9, 213 S.W.2d 438 (1948)). An important factor also to consider is the general scheme or plan of development and surrounding circumstances. *Brandon v. Price*, Ky., 314 S.W.2d 521, 523 (1958). Since the *Bran-*

*don* case was decided, "Kentucky has approached restrictive covenants from the viewpoint that they are to be regarded more as a protection to the property owner and the public rather than as a restriction on the use of property, and that the old-time doctrine of strict construction no longer applies." *Highbaugh Enterprises Inc. v. Deatrick and James Construction Co.,* Ky.App., 554 S.W.2d 878, 879 (1977).

■ Interpretation or construction of restrictive covenants is a question of law. Therefore, we review this matter de novo.

The Equestrian Estates neighborhood was developed by Stonewall Development, Inc., which shall hereinafter be referred to as "developer." Don Poole was the president of this corporation. The developer drafted restrictive covenants and recorded them with the Fayette County Clerk on June 6, 1966. On the same day, the developer recorded Articles of Incorporation for Stonewall Equestrian Estates Association, Inc., "to enforce any and all covenants, restrictions and agreements applicable to the property. . . ."

On January 27, 1976, the developer filed its Articles of Dissolution with the Secretary of State thereby terminating its corporate existence. Upon dissolution, the developer has had no further involvement in the management of the Equestrian Estates and no further corporate authority over the development.

To fully understand the issues, several of the restrictive covenants must be set out for reference. These include:

WHEREAS, Developer has incorporated under the laws of the Commonwealth of Kentucky a nonprofit corporation known and identified as STONEWALL EQUESTRIAN ESTATES ASSOCIATION, INC., for the purpose of maintaining and administering the common properties and facilities and administering and enforcing the covenants and restrictions and collecting and disbursing the assessments and charges hereinafter created,

. . . .

ARTICLE VII. GENERAL PROVISIONS.

Section 1. DURATION. The covenants and restrictions of this declaration shall run with and bind the land, and shall inure to the benefit of and be enforceable by the Association, or the Owner of any land subject to this declaration[.]

. . . .

Section 3. ENFORCEMENT. Enforcement of these covenants and restrictions shall be by any proceeding at law or in equity against any person or persons violating or attempting to violate any covenant or restriction, either to restrain violation or to recover damages, and against the land to enforce any lien created by these covenants; and failure by the Association or any Owner to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter.

. . . .

Section 6. GENERAL COVENANTS AND RESTRICTIONS.

. . . .

b) No house erected upon any lot shall be used for other than single family residential purposes; that each house must have a two-car garage attached, located in the basement or unattached, all unattached garages to be approved by the Developer.

. . . .

j) All plans and specifications for improvements on any lot in said subdivision shall be first approved by the Developer or his authorized agent.

Initially, it should be noted that it is undisputed that the Collivers were aware of the covenants, and, in fact, sought out their own copy of the same the day after signing the contract on the property. And the Collivers' attorney conceded at oral arguments in the trial court that the covenants were binding.

The first argument presented by the Collivers is that the developer was the only entity with approval authority over their proposed detached garage. Their actions contradict this position, however, because the Collivers first sought approval from the Association. They maintain that the "approval" they sought was simply to be cooperative and that they were not actually seeking authority to build their garage. However, only when the Association voted against their proposal twice did the Collivers contact an agent for Mr. Poole. The agent stated that he did not believe that Mr. Poole would have "any problem" with the garage. According to the Collivers' logic, the "developer" had given them approval to construct the garage.

The Collivers rely on the garage restriction at Article VII Section 6(b) of the restrictions. However, when considering that the intention of the developer governs and considering the general scheme or plan of the development, we cannot agree with the Collivers' reading of this restriction.

First of all, a dissolved corporate entity may not carry on any business other than winding up and liquidating its business and affairs. KRS 271B.14–050. The Collivers have presented no contrary authority.

Second, the developer intentionally created an Association to enforce and oversee the restrictive covenants running with the land to preserve the character of the neighborhood. To say that the developer intended to keep such approval authority over garages flies in the face of the very scheme it put in place. If this were indeed the case, why then did the developer incorporate an Association for the purpose of enforcement of the restrictions? Further, why would the developer dissolve if it intended to keep such power?

Instead, we find the reasoning of the Texas Court of Appeals instructive and persuasive wherein it held as follows:

> The restrictive covenants are to run with the land so that it is only reasonable that the machinery set up in the restrictive covenants concerning approval of plans by a committee must likewise continue to parallel the duration of the covenants, regardless of the dissolution of the corporation, the original grantor. If such were not the case the dissolution of the original corporate subdivider thereby automatically dissolves the … committee and results in a determination that [a particular covenant] is a personal covenant in favor of the original corporate subdivider. This is entirely inconsistent with the concept that these covenants are those that do run with the land.

*Johnson v. Linton,* Tex.Civ.App., 491 S.W.2d 189, 195 (1973).

In the present matter, the developer clearly intended the covenants to run with the land as opposed to being personal covenants. The developer planned a unique neighborhood with the neighborhood's future integrity to be protected by restrictive covenants and enforced by the Association.

Plainly, the developer intended at some point for the Association to take over enforcement of the covenants. This was the sole purpose for the creation of the Association. Accordingly, we agree with the circuit court that at the dissolution of the

developer, its authority passed to the Association.

■ Alternatively, the Collivers argue that even if the Association had the authority to approve or disapprove of their garage, such authority has been waived by failing to enforce other restrictions. They maintain that a variety of improvements violating the covenants have been allowed in the neighborhood, such as swimming pools, fences, and homes with second garages. Their arguments are not compelling for a variety of reasons.

The rule of law in regard to waiver of restrictions was succinctly stated in *Bagby v. Stewart's Ex'r*, Ky., 265 S.W.2d 75, 77 (1954):

"A change in the character of the neighborhood which was intended to be created by restrictions has generally been held to prevent their enforcement in equity, where it is no longer possible to accomplish the purpose intended by such covenant...."

(quoting 14 Am.Jur. *Covenants* § 302, page 646).

■ Arbitrary enforcement of covenants does not necessarily render covenants unenforceable. Instead, when arbitrary enforcement has resulted in a fundamental change in the character of a neighborhood, the purpose of the covenants may be defeated and accordingly become unenforceable.

"Where the restrictive covenant has not been rigidly enforced, and where certain structures and uses have been tacitly permitted which are violative of the strict terms, but where, in spite of such relaxation, there still remains something of substantial value to those entitled to benefit by its provisions, they are still entitled to enforce it insofar as they were not affected by the principles of estoppel and waiver. Applying this principle, it seems clear that under the testimony there is no estoppel, and there has been no waiver of the right to object to the building and operation of structures which partake in no degree whatever of the character of residences within this subdivision[.]"

*Hardesty v. Silver*, Ky., 302 S.W.2d 578, 582 (1956) (quoting *Polk Manor Co. v. Manton*, 274 Mich. 539, 265 N.W. 457, 458 (1936)).

Based upon the record, although the covenants have not been strictly enforced in reference to pools and fences, we cannot say that a fundamental change in the neighborhood defeating the purpose of the covenants has occurred. Furthermore, in giving intent to all the covenants as a whole, the Enforcement Clause includes that "failure by the Association or any Owner to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter."

Moreover, we find that even if such were the case in reference to pools, fences, etc., it clearly has not been the case with detached or second garages. There are a few homes with outbuildings or garage "doors" in the basement. However, there is no evidence that these are used as garages, and the specific covenant at issue deals with approval for "garages." Having specifically required prior approval for garages, this court " 'may not substitute what the grantor may have intended to say for the plain import of what he said.' " *Mascolino v. Noland & Cowden Enterprises, Inc.*, Ky., 391 S.W.2d 710, 712 (1965) (citing *McMahan v. Hunsinger*, Ky., 375 S.W.2d 820, 822 (1964)). Within the general scheme of the covenants at issue, the term "garage" must be given its usual meaning. *Id.* " 'The general term "garage," which is appropriated from the French language and means "keeping un-

der cover" or "a place for keeping" of wagons as well as automobiles, is employed in English to mean "a place where a motor vehicle is housed and cared for." ' " *Id.* (citing 24 Am.Jur. *Garages, Parking Stations, and Liveries,* § 481(2)).

While there are homes with sheds or additional garage "doors" in the basement, there is no proof that such are used for keeping automobiles. Instead, the proof is that they are used for storage or recreation. The Collivers had multiple cars and specifically requested approval for a detached "garage" for the purposes of housing automobiles. The covenants unmistakably restrict this use unless approval is given.

Another reason that the Collivers' garage is not in the class as other improvements in the neighborhood is the magnitude of the garage built. It is noticeably larger than other improvements. Further, the Association tried to work with the Collivers to modify the plans for the garage so that it would fit with the scheme of the neighborhood, but the Collivers refused to change their plans. We therefore conclude that the covenants have not been waived by lack of enforcement.

■ Next, there is the issue of whether the Association had the authority to assess the Collivers with a portion of the legal fees in this matter. The Association undoubtedly has the right to enforce the covenants via legal action. In Article VII Section 3 it states that:

> Enforcement of these covenants and restrictions shall be by any proceeding at law or in equity against any person or persons violating or attempting to violate any covenant or restriction, either to restrain violation or to recover damages. . . .

It is simple logic that the only persons who can violate the covenants are the homeowners in the neighborhood. Consequently, therefore, it is clear that the homeowners can be sued for any such violation. The covenants give the Association the power to levy special assessments for a variety of reasons. Obviously, preserving the integrity of the neighborhood through litigation would follow under this category, and no exceptions are made to paying the assessment to violators of the covenants who themselves may be the opposing party in a lawsuit. Therefore, we find the court did not err in ordering the Collivers to pay the special assessment for the lawsuit.

■ Finally, there is the issue of what to do with the garage now that it is constructed. The Collivers first present that the Association's failure to seek judicial enforcement of the status quo denies it the right to complain after the status quo has changed. They rely strongly on *Greene v. Eversole,* 296 Ky. 437, 177 S.W.2d 559 (1944). However, their reliance is misplaced.

In *Greene,* the plaintiff did nothing until *after* a wall was totally constructed, and later filed suit. This is highly distinguishable from the present case. It is undisputed that the Collivers knew the Association would take legal action if necessary. Once the Collivers began construction on the garage, the Association filed a lawsuit in the same month. In *Vaughan v. General Outdoor Advertising Co.,* Ky., 352 S.W.2d 562, 565 (1961), the court held that the plaintiff acted "diligently and timely" after waiting a period of two months to enforce restrictive covenants. We likewise conclude that in the present case the Association acted diligently and timely.

Further, in its prayer for relief, the Association sought a permanent injunction and "that in the event the Defendants proceed with the construction of the garage notwithstanding the filing of this ac-

tion contesting their right to build such a structure and such garage is complete, that this Court order the Defendants to remove said garage...." Despite the pending litigation and relief sought, the Collivers continued with the construction of the garage at their own peril. They took an unwise risk and expended a large amount of money in spite of this litigation and the Association's clear disapproval of their garage. Therefore, we affirm the order of the circuit court requiring the Collivers to remove the structure in its entirety immediately.

ALL CONCUR.