RENDERED: MAY 1, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0830-MR

TIMOTHY L. STRUNK; JAYNA G.
STRUNK; AND STRUNK REAL
ESTATE, LLC                                                    APPELLANTS


                    APPEAL FROM SCOTT CIRCUIT COURT
v.              HONORABLE KATHRYN H. GABHART, JUDGE
                         ACTION NO. 21-CI-00026


GREG TAYLOR AND TAMRA
TAYLOR                                                             APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, KAREM, AND McNEILL, JUDGES.

COMBS, JUDGE: This case involves a dispute between the developer of a

residential community and a prospective lot owner seeking to build a residence. At

issue is compliance with pertinent covenants and restrictions along with the

process governing building proposals. Timothy L. Strunk, Jayna G. Strunk, and

Strunk Real Estate, LLC, (referred to collectively as "the Strunks") appeal from an

order of the Scott Circuit Court that required Timothy Strunk, as developer, to approve the plan of Greg Taylor and Tamra Taylor to construct a home with a white exterior and a garage sitting forward with respect to the house in Pemberley Cove. After our review, we affirm.

Pemberley Cove is a single-family residential development in Georgetown composed of twelve lots. It was developed by Timothy and Jayna Strunk, who intended to create a neighborhood of exclusively "classical or traditional style homes." Timothy and Jayna Strunk are members of Strunk Real Estate, LLC, a Kentucky limited liability company. At the time of these proceedings, the Strunks lived at 104 Pemberley Cove Lane. Greg and Tamra Taylor own an undeveloped adjacent lot at 106 Pemberley Cove Lane.

When the property was initially subdivided, the Strunks' attorney drafted and filed in the Scott County Clerk's office a Declaration of Covenants and Restrictions for Pemberley Cove Subdivision. The covenants and restrictions are applicable to all the building lots in the development, and they govern the architecture, minimum square footage, construction materials, roof pitches, placement of garages, and other design features of homes to be built in the community. They provide, in part, as follows:

> WHEREAS, Developers are developing a residential community known as Pemberley Cove and subdividing tracts from the above-described property (Plat Cabinet No. 9, Slide No. 24) and desire to maintain uniformity

-2-

with respect to the use and occupancy of said property in order to maintain and/or enhance the value thereof and to render said property more attractive in appearance;

\* \* \* \* \*

(2) <u>BUILDING PLANS AND SITE PLANS</u>.  Prior to commencement of construction on any Tract of the property, such Tract owner shall submit to Developers (or Developers designee) for a written approval any and all building plans and specifications, name of builder, landscape plans and site/plot plans.  Once construction of the residential structure is commenced, it shall proceed with due diligence until completion; provided, however, construction of said permanent residence shall be completed no later than eighteen (18) months from groundbreaking.

(3) <u>BUILDING MATERIALS</u>.  All residential . . . structures shall be constructed of brick or stone or other material approved by the Developers . . . which is consistent with a house of classical architecture.  In addition, all roofing shall be a minimum of thirty (30) year dimensional singles.

(4) <u>RESIDENTIAL STRUCTURE/MINIMUM SQUARE FOOTAGE</u>.  The front of all residential structures shall face the Common Area Lake and shall be traditional or classical architecture except where otherwise expressly approved by Developers . . . ; further, any variation approved shall, in the sole judgment of the Developer . . ., be compatible with the neighborhood, deemed attractive and tasteful in appearance, and anticipated to enhance the value of the neighborhood . . . .

\* \* \* \* \*

(b) One and One-half Story Structure: 3,000 square feet of living space for combined first and second story floors
. . .

* * * * *

(5) GARAGES.  The residential structure on each Tract of the property must be accompanied by, at a minimum, a two (2) car garage which is distinct architecturally (but not necessarily detached) from the main residential structure (in other words, the garage may not share a roof line with the main house).  All garages . . . shall be side and rear entry garages only and shall be constructed or positioned so that the vehicular garage door(s) is (are) not parallel with the front of the main house nor shall the entrance to the garage be visible from the Common Area Lake Dock.

The Taylors were aware of the covenants and restrictions governing construction when they purchased their property from a third-party in July 2020. Shortly after the purchase, Greg Taylor sent Timothy Strunk the following text message:

Tim it's Greg your new neighbor.  I just wanted to confirm that brick is the one and only option for outside. If so we wanted to do a white brick but we are being told it's about double in cost vs standard color brick.  So the more feasible option would be to get a standard and paint it.  Just let me know as we are in the process of design and trying to get rough estimates on pricing.  Thanks.

Strunk replied, indicating that another property owner considered painting a brick exterior white but decided against it because of the added cost.  Strunk did not indicate that a white exterior was unacceptable.

About a month later, Taylor sent Strunk a picture of the Taylors' house plan. Strunk replied as follows:

> Looks like the garage in the right side is forward if (sic) the house. Front wall of the garage needs to be set back from the front wall of the house. We want everyone to see your house and not focus on the garage. Brick required on the gable.

Prior to this exchange, the Taylors were unaware that their garage could not be placed forward of the house.

Two months later, in mid-November 2020, the Taylors' builder submitted preliminary plans to Strunk by e-mail. The color of the brick was not designated. While the garage appeared to meet the requirements specified by the covenants and restrictions, the plan continued to depict the garage's most forward wall as being even with the front porch of the house.

Strunk immediately sent an email in response and copied Taylor. Strunk's reply indicated a number of concerns with the plan. Again, Strunk explained that the garage was too far forward.

The following day, Taylor emailed his builder and Strunk depictions of several homes. He indicated that the Taylors intended to build a home similar "to the all white one." Strunk responded and expressed some general concerns about the farmhouse style depicted in the Taylors' example plans. He explained

that it was not "stately enough to look right next to the existing house at 104."

Additionally, he wrote as follows:

> Another concern is that most of the farmhouse style houses are white or cream. Not sure exactly where I will come out on this but wanted to give you a heads up that several plans submitted prior to yours had white/cream exteriors and I'm concerned the neighborhood will be out of balance with too many white/cream houses.

On November 20, 2020, Strunk rejected the Taylors' preliminary plans. He cited a number of concerns, including the building materials, garage placement and roof size, and a lack of architectural detail. Additionally, Strunk stated that the plans were not approved for a white or cream exterior. He explained as follows:

> Factors determining whether another plan would be approved with a white/cream exterior include architectural appeal and overall neighborhood harmony because white is a very attention focusing color. This characteristic drives the concern regarding: a) it is not desirable that the white color primarily attracts attention to the house; the desire is for architectural features to attract attention, and b) several houses in the neighborhood have already been approved for white/cream, too many white houses would not lead to neighborhood aesthetic harmony.

On December 5, 2020, the Taylors' builder sent Strunk another house design for preliminary review. Strunk then sent Taylor an email outlining the nature of the approval process. He advised Taylor that per the restrictions, he (Strunk) alone would decide whether a house plan was suitable for the

-6-

neighborhood and that his decision settled the matter. Strunk indicated that he had decided "to avoid additional white exteriors in the neighborhood, particularly on a small lot such as 106 where the homes will be close together." Finally, Strunk outlined the contents required to be included in a final submission:

> the plan package needs to include the house plan, lot plan, landscaping plan, erosion control plan, and if applicable, fencing plan, plus any other plans called for in the development restriction which may be relevant.

On January 21, 2021, the Taylors filed a civil action against the Strunks. The Taylors alleged that the Strunk was unreasonably withholding approval of their plans for a home in the neighborhood. They characterized as arbitrary Strunk's objections to the placement of the garage; exterior color of the home; and architectural detail. The Taylors sought an order requiring Strunk to approve the planned exterior color and garage placement.

The Strunks answered the complaint. They admitted that the Taylors' builder had emailed a set of plans for a home which were described as "preliminary." However, the email did not include a site plan or landscape plan. Furthermore, the Strunks explained that the preliminary plans did not conform to the development's restrictions for a number of reasons, including the garage placement and exterior building materials. Additionally, the Strunks denied that the preliminary plan depicted a 1½ story home. They alleged that the preliminary plan depicted a ranch with a floored attic and bonus room over the garage. The

-7-

Taylors were permitted to amend their complaint to include a claim for damages related to the increased costs of building resulting from Strunk's unreasonable delay in approving their plans.

The trial court required the parties to submit pretrial memoranda. From these documents, it concluded that the dispute centered on the white exterior color of the house and the forward placement of the garage.

A bench trial was conducted over the course of two days. During his testimony, Taylor confirmed that he and his wife submitted construction plans a month before the trial date and that these plans had been approved by Strunk -- except for the white exterior and the location of the garage.

Nearly a year later, the trial court's order was entered on April 3, 2025. In its findings of fact, the trial court concluded that Timothy Strunk denied the Taylors' plans "for a white exterior home and a garage set in front of their home in an arbitrary and unreasonable manner." However, the court rejected the Taylors' claim for money damages.

In accordance with our rules of civil procedure, the Strunks filed a motion to alter, amend, or vacate the court's judgment on April 15, 2025. Kentucky Rules of Civil Procedure (CR) 59.05. In large part, the motion was denied. This timely appeal followed. Although the Taylors filed a cross-appeal,

they have made no argument in support of it in their brief. Thus, we do not address it further.

On appeal, the Strunks argue that the trial court misinterpreted the interplay between the minimum requirements declared in the covenants and restrictions and the unfettered discretion of the developer to reject any plan -- regardless of whether these requirements were met. They contend that the trial court erred by essentially equating subjectivity with arbitrariness and by finding that Strunk was motivated by self-interest because the Taylors' property was adjacent to the Strunks' property.

Upon reviewing a bench trial, we are governed by the provisions of CR 52.01. The trial court is required to make specific findings of fact and to state separately the conclusions of law underlying its judgment. Its "[f]indings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. Additionally, "judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Vinson v. Sorrell*, 136 S.W.3d 465, 470 (Ky. 2004) (quoting *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)). Where the trial court's findings of fact are supported by substantial evidence, our role is confined to determining whether those facts support the trial court's conclusions. *Commonwealth v. Deloney*, 20 S.W.3d 471, 473–74 (Ky. 2000).

While we defer to the trial court's authority to make findings of fact at a bench trial, our review of its legal conclusions is *de novo*. *Sawyers v. Beller*, 384 S.W.3d 107, 110 (Ky. 2012). Interpretation or construction of restrictive covenants is a question of law. *Triple Crown Subdivision Homeowners Ass'n, Inc. v. Oberst*, 279 S.W.3d 138, 141 (Ky. 2008).

Following its analysis of the facts and the applicable law, the trial court concluded that the covenants and restrictions governing Pemberley Cove clearly authorize the developer to reject a construction plan where it fails to conform to the development's specific requirements. In addition, in his discretion, the developer could grant variances from the specific restrictions. However, the trial court was not entirely persuaded by the Strunks' argument that the provisions authorized the developer -- in the exercise of his discretion -- to reject plans even where they did not appear to violate any specific restriction.

The trial court summarized the Strunks' construction of the covenants and restrictions as follows: the restrictions require that the specific standards be met in anything approved, but "meeting these [specific] standards does not equate with approval." The court noted that the structure and placement of the specific standards provisions within the instrument "make it confusing and possibly ambiguous." It concluded that the "scheme suggests that this level of discretion may not have been the original intent of the Covenants and Restrictions."

-10-

Ultimately, the trial court held that regardless of how the breadth of his discretion was defined, Strunk could not exercise that discretion arbitrarily or unreasonably. Applying the law to the facts as it found them, the court concluded that Strunk's decision to reject the Taylors' plans was, in fact, arbitrary and unreasonable. We agree.

Historically, our jurisprudence has disfavored restrictive covenants because they were regarded as a burden upon the free use of one's property. *See Colliver v. Stonewell Equestrian Estates Association, Inc.*, 139 S.W.3d 521, 523 (Ky. App. 2003). Consequently, they were strictly construed, *i.e.*, any doubt regarding their meaning was resolved against enforcement. *See Glenmore Distilleries Co. v. Fiorella*, 273 Ky. 549, 117 S.W.2d 173, 176 (1938). However, restrictive covenants have evolved and are now viewed more appropriately as a means of protecting a property owner's investment. *See Highbaugh Enterprises Inc. v. Deatrick & James Construction Co.*, 554 S.W.2d 878, 879 (Ky. App. 1977). As a result, restrictive covenants are **not strictly construed** against one seeking to enforce them. *Id.*

Restrictive covenants governing the use of real property are enforceable according to their terms. *Hensley v. Gadd*, 560 S.W.3d 516, 518 (Ky. 2018). Consequently, "[w]e may not substitute what the grantor may have intended to say for the plain import of what he said." *Id.* at 521-22 (citing

-11-

*Mascolino v. Noland & Cowden Enters., Inc.,* 391 S.W.2d 710, 712 (Ky. 1965)).

Nor can we remake contracts for parties or create ambiguity where none exists.

*O.P. Link Handle Co. v. Wright,* 429 S.W.2d 842, 847 (Ky. 1968) ("Under the

guise of interpretation, courts are repeatedly importuned to give a meaning to the

writing under consideration which is not to be found in the instrument itself, but

which is based entirely on direct evidence of intention.  And just as steadfastly, the

courts (this court, at least) reiterate the well-established principle that it is not the

function of the judiciary to change the obligations of a contract which the parties

have seen fit to make."  (citing *Willison on Contracts*, Third Edition, s 610A (Vol.

4, p. 513)).  Instead, parties are bound by the plain and ordinary meaning of the

language used in the restrictive covenant -- the same as any other contract.

*Nationwide Mutual Insurance Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999).

Every part of the instrument will be given meaning and effect where possible.

*McFarland v. Hanley*, 258 S.W.2d 3, 5 (Ky. 1953).  Again, because the

interpretation or construction of restrictive covenants is a question of law, we

review this matter *de novo.  Stonewall Equestrian Estates Ass'n, Inc.*, 139 S.W.3d

at 523.

We must first consider the provisions of Pemberley Cove's covenants

and restrictions.  They provide specific requirements for a home's garage.  Again,

the instrument provides as follows:

(5)  GARAGES.  The residential structure on each Tract of the property must be accompanied by, at a minimum, a two (2) car garage which is distinct architecturally (but not necessarily detached) from the main residential structure (in other words, the garage may not share a roof line with the main house).  All garages . . . shall be side and rear entry garages only and shall be constructed or positioned so that the vehicular garage door(s) is (are) not parallel with the front of the main house nor shall the entrance to the garage be visible from the Common Area Lake Dock

The plain language of this provision does not prohibit the placement of the home's garage forward of the house.  It provides that the garage must accommodate at least two automobiles; be architecturally distinct from the house (*i.e.*, not share a roofline); and be side or rear entry.  The garage doors cannot be parallel to the front of the house and its doors must not be visible from the common area lake dock.  Nothing in the language of section 5 "Garages" requires a garage to be set back from the front of the home.

Distinctly different is section 6 of the covenants and restrictions governing accessory structures.  It provides as follows:

(6)  NON-RESIDENTIAL ACCESSORY STRUCTURES.  There may be a maximum of two (2) additional non-residential accessory structures (such as unattached garage, storage shed and/or greenhouse) constructed on each Tract of the Property that is less than ten (10) acres.  The exterior of all such additional non-residential accessory structures constructed on any such Tract must be either wood, brick or stone and must be compatible with, but not necessarily constructed of the same material as, the main house.  **All such additional**

-13-

> **non-residential accessory structures shall be
> constructed behind the real line of the main house (in
> an attempt to minimize the visibility of such
> structures from the Common Area Lake dock).** The
> roof of any non-residential accessory structure shall not
> exceed (at any point) sixteen feet (16') in height from the
> ground. In addition, any and all plans and specifications
> (including location) for such non-residential accessory
> structure shall also be submitted to Developers (or
> Developers' designee ) for written approval prior to any
> construction.

(Emphasis added.) This provision specifically restricts placement of additional

non-residential accessory structures (such as unattached garage, storage shed

and/or greenhouse) to a point "behind the real line of the main house."

By its terms, the provisions of section 6 are inapplicable to the

placement of the principal garage to which Strunk objects. The requirements of

section 6 apply only to *additional* structures, and the restrictions have been placed

in a separate and distinct provision of the covenants and restrictions. Furthermore,

the provision expressly limits its application to structures such as unattached

garages, storage sheds, and/or greenhouses. This language does not include the

principal garage required by the covenants and restrictions as part of the home's

construction. If the Strunks intended to prevent a homeowner from extending the

front of the principal garage beyond the front of their home (or to retain discretion

to approve the placement of the home's garage), they could have provided

language indicating that intention in section 5. They did not.

-14-

Similarly, the Taylors' plan for a white exterior does not violate any specific requirement of the covenants and restrictions. Where a home is constructed of brick (or stone or other approved material) and retains its character as "classical" or "traditional," Pemberley Cove's covenants and restrictions do not specifically govern its exterior color. Nor do the restrictions purport to limit the number of homes that made be constructed of any particular exterior color.

Again, distinctly different are the specific requirements of section 16 of the covenants and restrictions regarding fences. Section 16 provides as follows:

> (16) <u>FENCES.</u> Fencing shall not be required [any shall only be allowed in front yards with prior written approval of Developer (or Developer's designee)]. However, any Tract of the Property which will contain a horse (or horses) shall be required to have four-plank or number 9 woven wire fencing around the area which contains the horse (or horses). **In addition, all such fencing material and color (and proposed location thereof) shall be submitted to Developer (or Developers' designee) for written approval prior to any construction/installation of such fencing**. In addition, the design (and materials) of any and all fencing to be used for the restraint of dogs shall also be submitted to Developers (or Developers' designee) for approval prior to any construction/installation of such fencing or restraint.

(Emphasis added.) This restriction plainly provides that approval of the color of the home's *fencing* remains a matter within the developer's discretion. Again, if the Strunks had meant for Timothy Strunk to retain unfettered discretion to grant or to deny approval of a house plan based upon the home's exterior color, they could

-15-

have provided language as indicating in the covenants and restrictions. They did not.

Neither the Taylors' plan for the location of their home's garage nor their plan for a white exterior violates any specific term of the development's restrictions. Furthermore, the trial court found that the Strunks' own definitions of "classical" and "traditional" architecture do not exclude a farmhouse. If the Taylors' plans had not conformed to the specific requirements of the covenants and restrictions, the instrument provides in section 4 that they could invoke the developer's discretion in hopes of securing approval for construction anyway. However, because the placement of the Taylors' garage and the exterior color of their house conform to the requirements of the covenants and restrictions, they did not ask Strunk to exercise his discretion to permit a variation in the building requirements.

Despite this plain reading of the covenants and restrictions, the Strunks contend that the exterior color of the planned farmhouse and the placement of its garage fail to conform to the overall style aesthetic that "transcends" the specific restrictions – an aesthetic which is mutable and enforceable according to Strunk's sole discretion. They contend that the language of section 2, entitled <u>BUILDING PLANS AND SITE PLANS</u>, creates this overriding discretion.

Again, section 2 provides that the landowner must -- before construction begins -- "submit to Developers (or Developers' designee) for written approval any and all building plans and specifications, name of builder, landscape plans and site/plot plans." For purposes of our discussion, we refer to this provision as a "general consent-to-build" clause. The Strunks contend that the existence of this provision is sufficient to alert property owners that approval to build any home in the neighborhood is entirely within his discretion.

We generally agree with the Strunks' premise that developers (or designated third parties) may retain -- through written covenants and restrictions -- wide discretion and broadly subjective decision-making authority with respect to approving plans for construction in their residential developments. *See La Vielle v. Seay*, 412 S.W.2d 587, 592 (Ky. 1966) ( where the grantors were expressly authorized "to refuse to approve" any structure applied for which was not in their opinion suitable or desirable).

However, the developer's discretion may never be exercised in a manner that is found to be unreasonable or arbitrary. *Highbaugh Enterprises Inc. v. Deatrick & James Const. Co.*, 554 S.W.2d 878, 880 (Ky. App. 1977). Additionally, while some courts enforce covenants and restrictions which include both objective specific requirements and a subjective general consent-to-build clause, many hold that a consent-to-build clause cannot implement more

-17-

burdensome restrictions on a lot than those imposed by the specific covenants. *See Catalina Square Imp. Committee v. Metz*, 630 S.W.2d 324, 327 (Tex. App. 1982); *Validity and Construction of Restrictive Covenant Requiring Lot Owner To Obtain Approval of Plans for Construction or Renovation*, 115 A.L.R.5th 251 (originally published in 2004). In light of the facts and circumstances of this case, we are persuaded that the specific covenants pre-empt the unfettered discretion that Strunk has sought to exercise.

Assessing the language used in the Pemberley covenants and restrictions and giving it its plain and ordinary meaning, we reject the Strunks' position that the developer retained -- through the general consent-to-build clause included in section 2 -- sole discretion to withhold approval for plans that otherwise conformed to the specific requirements provided therein. The instrument must be construed as a whole. It includes very specific provisions governing permissible architecture, square footage, construction materials, roof pitches, placement of garages (and their doors), and other design features of homes to be constructed. It governs -- in great detail -- construction of accessory structures, driveways, and mailboxes; provides restrictions for lawn development, including removal of trees during construction and planting of specific trees; and it establishes specific standards for fence construction, pool installation, and building materials for mailboxes.

It also specifically describes the nature of the developer's discretionary authority -- but *only* in relation to a property owner's desire to build a home with features that fail to conform to the specific requirements identified in the instrument. Given the specificity of the myriad requirements governing construction in the community, we cannot interpret the instrument as giving the developer authority to withhold approval -- for any reason, including purely aesthetic ones -- where the property owner's plans comport with the specific restrictions. If the developer were deemed to enjoy unfettered discretion to reject conforming plans, the specific restrictions would be rendered largely meaningless or superfluous. Strunk cannot argue credibly that the restrictions and covenants at issue gave the Taylors sufficient notice of the limitations on the use of their lot. *See Marcus v. Whispering Springs Homeowners Ass'n, Inc.*, 153 S.W.3d 702, 708 (Tex. App. 2005) (Approval covenants are valid to the extent they furnish adequate notice to the property owner of the specific restriction sought to be enforced.).

In light of the specific and unambiguous provisions of the covenants and restrictions considered here, the Strunks' contention that Strunk retained essentially limitless discretion to reject any and all submitted plans is untenable. We hold that where a property owner's plans plainly conform to specific and unambiguous covenants and restrictions governing the development, arbitrary rejection of the plans is unenforceable. To summarize, the restrictions and

-19-

covenants for Pemberly Cove do not vest Strunk with any authority to disregard their plain and unambiguous language and to bind the Taylor's instead to the exercise of his unfettered discretion. There is no indication that Strunk's decision to reject the Taylors' plans for exterior color and garage placement was reasonable or made in good-faith reliance upon the terms of the restrictions. Consequently, the trial court did not err by concluding that the Taylors were entitled to an order requiring Strunk to approve their plans.

We affirm the order of the Scott Circuit Court.


ALL CONCUR.


BRIEFS FOR APPELLANT:

John M. Sosbe
Stamping Ground, Kentucky

BRIEF FOR APPELLEES:

Richard M. Rawdon
Georgetown, Kentucky

Alexander C. Cantrill
Georgetown, Kentucky